**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PATRICIA A. ALLEN,       :
              :
   Plaintiff,       :   Civil Action No.:  18-1214 (RC)
              :
   v.         :   Re Document Nos.: 80, 104
              :
JANET YELLEN, Secretary of the Treasury, :
              :
   Defendant.      :

<u>**MEMORANDUM OPINION**</u>

**Denying Defendant's Motion for Summary Judgment and
Granting Plaintiff's Motion for Leave to File Surreply**

## I. INTRODUCTION

Patricia Allen ("Plaintiff") brings this employment discrimination action against Janet
Yellen ("Defendant"), the Secretary of the Treasury, in her official capacity. Plaintiff alleges
that her employer, the United States Bureau of Engraving and Printing ("BEP" or "Agency"),
subjected her to a hostile work environment based on race, gender, and retaliation in violation of
Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*,
due to the behavior of a coworker and BEP's related response. Defendant moves for summary
judgment on Plaintiff's three hostile-work-environment claims. Because Defendant has not
demonstrated entitlement to judgment as a matter of law on these three claims, Defendant's
motion is denied.

## II.  BACKGROUND[1]

### A.  Factual Background

Plaintiff is employed at BEP as a Supply Technician in the Office of Materials Technology.  Mem. L. Supp. Def.'s Mot. Summ. J. ("Mem.") at 1, ECF No. 80-1.  She identifies as Black and female.  *Id.*  Andrew Wilson, a white male, worked in the same office as a Chemist.  Mem. at 3.  Julie Evans, a white female, supervised both Plaintiff and Wilson at BEP.  *Id.*  Plaintiff and Wilson "initially had desks in the same second-floor office and both of them had responsibilities that required them to work in a laboratory on the sixth floor."  *Id.*

On April 30, 2008, Plaintiff and a colleague, Sireda Foster, who is also Black and female, were watching CNN at work and having a political conversation.  Pl.'s Opp'n & Resp. Def.'s Statement of Undisputed Facts ("SUMF Resp.") ¶ 1, ECF No. 83-6.  Plaintiff commented either that "we need a change" or that "we need to get the Republicans out of office," likely referring to the 2008 U.S. presidential election and Barack Obama's candidacy.  *Id.* ¶¶ 2–3; Opp'n to Mot. ("Opp'n") at 1, ECF No. 99.  In response, Wilson either threw or kicked an empty trash can toward Plaintiff.  SUMF Resp. ¶¶ 4–5.  Plaintiff believes that the trash can was metal and that it barely missed her head.  *Id.* ¶ 5; Opp'n at 9.  Foster testified that, during this incident and shortly after Plaintiff left the room, Wilson was "shouting racial slurs like . . . 'kill the coon.'"  Opp'n Ex. 11 at 10:8–16, ECF No. 83-18.  Plaintiff claims that Foster recounted this exclamation to Plaintiff that same day.  Opp'n Ex. 12 ¶ 6, ECF No. 83-19.  Wilson later admitted that he lost his temper.  SUMF Resp. ¶ 5.  It appears undisputed that Wilson was a "staunch Republican."  *Id.*

---

[1] Facts in this section are undisputed unless otherwise noted, such as by noting that evidence shows a fact as opposed to stating the fact outright.  The parties' filings do not facilitate easy citation to all facts that the Court understands to be undisputed, and therefore this section represents the Court's best understanding of those facts from its review of the filings and cited evidence.

¶ 6 (purporting to dispute the fact but not explaining basis).  Plaintiff reported the incident to Evans, another superior, and Agency police.  *Id.* ¶ 7.  There is evidence that, during that meeting, Evans stated that "Foster must have misunderstood what Mr. Wilson yelled[,] . . . asked Mrs. Foster [if] she [was] sure," and said that their filing of a complaint "would make things difficult on [them]."  Opp'n Ex. 12 ¶ 9; Opp'n Ex. 11 at 12:7–12.  Evans later asked Wilson to apologize to Plaintiff and he did so in Evans's presence, although Plaintiff recalls Wilson and Evans smiling during the apology.  *See* Mem. Ex. A at 5, ECF No. 80-4 ("Ms. Julie Evans . . . ask[ed] Mr. Wilson to apologize for his attempted physical assault and battery on my person.  Mr. Wilson apologized in the presence of Ms. Evans, while looking at me and Ms. Evans smiling as if he were a mad person.  I then realized that Mr. Wilson intended to harm me and that Ms. Evans did not take the matter seriously."); Opp'n at 10 (noting that both Evans and Wilson were smiling during the apology).  "The agency moved Mr. Wilson's desk to a different room around the corner, warned employees about engaging in political discussion in work areas, instructed that Plaintiff and Mr. Wilson should not be alone together, and arranged for periodic 'walk throughs' by Agency police of the work areas of Plaintiff and Mr. Wilson."  SUMF Resp. ¶ 7.  But the desk move did not occur for several weeks and Wilson was not moved very far.  *Id.* "The Agency subsequently issued a Notice of Decision disciplining Mr. Wilson based on this incident," which included at least a two-day suspension.  *Id.* ¶ 9; Opp'n at 11.  There do not appear to be contemporaneous records of Wilson using the racial slur.  *See* Opp'n at 10 ("In fear of retaliation/reprisal from Mrs. Evans, Mrs. Foster and Plaintiff did not include in the report Mr. Wilson's exclamation, 'Kill the Coon,' though they explained the exclamation to Officer Snow and Mrs. Evans.").

On June 4, 2008, another employee, Rachelle Wright, reported that Wilson said that "there was no fuc…g way a Black man would become president," or words to that effect.  SUMF Resp. ¶ 11.  "Plaintiff was not present for this incident, but she accompanied Ms. Wright to make a complaint . . . ."  Mem. at 4.  According to Plaintiff, on June 23, 2008, Evans selected Plaintiff and two other Black, female employees who had previously filed claims against Wilson to assist in a clean-up detail.  Opp'n Ex. 1 at ECF p.106, ECF No. 83-8.  On July 23, 2008, Plaintiff filed a complaint regarding the trash-can incident, Wright's incident, and the clean-up.  SUMF Resp. ¶ 8; Mem. at 4.  It appears that Plaintiff filed at least five complaints: 2003 (white male employee at higher pay level), 2008 (trash-can incident), 2009 (regarding promotion), 2011 (coughing incident), and 2012 (elevator incident).  Mem. at 29.

On July 27, 2011, Plaintiff and Wilson passed by each other at work when Wilson coughed without covering his mouth.  SUMF Resp. ¶ 19.  According to Plaintiff, Wilson was close to Plaintiff when this occurred, the cough was faked, and the cough "channeled cough residue towards my face."  *Id.*  Plaintiff told Wilson that he should cover his mouth, to which he responded, according to Plaintiff, "Only a stupid idiot person would say that."  *Id.* ¶¶ 20–21.  Immediately after the incident, Plaintiff reported it to Evans and another supervisor.  *Id.* ¶ 23.  Wilson later "apologized to Plaintiff, saying that he did not mean what he said."  *Id.* ¶ 25.  Evans told Wilson that he cannot say things like that and advised him to avoid direct comments to Plaintiff.  *Id.* ¶ 26.  The next day, the Agency's "Violence Intervention Team [("VIT")] recommended that Plaintiff and Mr. Wilson continue to have limited contact with each other."[2]

---

[2] The VIT "is an Agency resource that advises management when employees report allegations of threats, violence, harassment, or intimidation."  Mem. at 6 n.8.

*Id.* ¶ 27.  Evans "arranged" for Wilson's co-workers to meet him in places less likely to cause interactions with Plaintiff.  *See id.* ¶¶ 28–29.

On February 23, 2012, Plaintiff and Wilson encountered each other as Plaintiff was exiting an elevator and Wilson was approaching the elevator.  *Id.* ¶¶ 37–40.  Plaintiff claims that when Wilson saw her at the elevator, he approached her and "hit at" her with his cane twice while she pleaded with him not to hit her and Wilson yelled.  *Id.* ¶¶ 41–42.  Wilson stated that he raised his cane to protect himself after Plaintiff told him "in a very angry tone of voice that [he] was supposed to stay away from her."  *Id.* ¶¶ 44–45.  Plaintiff then went back into the elevator and left the area.  *Id.* ¶ 43.  Plaintiff believes that she was falsely accused of lying about the attack by claiming that Wilson struck her, instead of merely striking "at" her, and there is at least some evidence that the former claim (of being struck) was attributed to Plaintiff.  *See* Opp'n Ex. 3 at ECF p.195, ECF No. 83-10 (memorandum stating that "Allen allegedly reported to being physically assaulted by Wilson to Zachary Henderson" and that "Henderson alleged Allen later reported Wilson did not strike her, but raised his cane in a threatening manner").  The accusation led to an investigation of Plaintiff.  Opp'n at 35.  On March 1, 2012, based on advice from the VIT, Evans issued a Separation Order to Plaintiff and Wilson ordering them to maintain a ten-foot distance to the extent possible, refrain from verbal communication, and raise issues regarding the other with Evans.  SUMF Resp. ¶¶ 47–48.

On June 25, 2012, a white male employee, Gary Cloth, walked by Wilson and Wilson "lifted his cane in an apparently 'angry gesture.'"  *Id.* ¶¶ 55–56.  Shortly thereafter, Cloth told Wilson that he did not want Wilson joking with his cane, to which Wilson responded that he was not kidding.  *Id.* ¶ 57.

There are a few other, similar incidents alleged by Plaintiff and supported by at least some evidence, such as Wilson "constantly" walking the hallway near her work area, SUMF Resp. ¶ 30, staring at Plaintiff, *id.* ¶ 32, entering rooms where she was present, which appears to have violated the Separation Order on at least one occasion, *id.* ¶¶ 33, 35, 61, and, in Plaintiff's opinion, threatening her by saying "If you tell one more thing on me," *id.* ¶ 60.  But the most serious ones are described above, and these are enough to decide the motion.  It is also difficult to clearly discern each incident due to Plaintiff's disorganized and confusing brief.  Additionally, there is at least some evidence that Wilson was generally excitable and periodically expressed anger, that he got along well with Black and female co-workers, and that some co-workers had not experienced discriminatory behavior from Wilson.  *See, e.g.*, SUMF Resp. ¶¶ 65–74.

### B.  Procedural Background

On March 5, 2018, the U.S. Equal Employment Opportunity Commission ("EEOC") issued a decision regarding Plaintiff's 2011 and 2012 complaints, including her race, sex, and retaliation hostile-work-environment claims, that found no discrimination and informed Plaintiff of her right to file civil suit within 90 days.  Mem. at 11.  Plaintiff filed her initial complaint with this Court on May 23, 2018, followed by an amended complaint on October 11, 2018.  *See* Compl., ECF No. 1; Am. Compl., ECF No. 12.  Two weeks later, Defendant moved to dismiss and for partial summary judgment.  *See* Mot. Dismiss in Part & for Partial Summ. J., ECF No. 13.  The Court's opinion resolving Defendant's motion to dismiss and for partial summary judgment held that Plaintiff has three remaining live claims stemming from Plaintiff's claims of retaliation, disparate treatment, and harassment: "1) hostile work environment based on retaliation; 2) hostile work environment based on race discrimination; and 3) hostile work environment based on gender discrimination."  *Allen v. Mnuchin*, No. 18-cv-1214, 2019 WL

2581323, at *11 (D.D.C. June 24, 2019).  The Court explained that, despite the confusing organization of Plaintiff's complaint, "Plaintiff may rely upon the factual allegations contained in the entirety of her Amended Complaint to support the three overarching claims of hostile work environment, regardless of the specific count under which such factual allegations appear."  *Id.* Plaintiff's equal employment opportunity ("EEO") claim was dismissed due to Plaintiff's withdrawal.  *Id.* at *1.  Plaintiff's claim of race and sex discrimination was dismissed "to the extent that [it] does not present any unique facts or distinct legal theories."  *Id.*

Following discovery, Defendant moved for summary judgment on December 14, 2020. *See* Mem.  Plaintiff's initial opposition substantially exceeded the page limit imposed by the local rules, prompting a motion to strike from Defendant on that and other grounds.  *See* Pl.'s Opp'n Mot. Summ. J., ECF No. 83-4; Def.'s Mot. Strike Pl.'s Summ. J. Opp'n, ECF No. 86. Plaintiff subsequently filed two revised opposition briefs, the latter of which Defendant has replied to and treated as operative despite lack of clear permission from the Court for Plaintiff's second revision.  *See* Opp'n; Reply Supp. Def.'s Mot. Summ. J. ("Reply"), ECF No. 103; *id.* at 3 n.2 (stating Defendant's understanding that "the operative opposition brief" is "the 45-page unredacted opposition that Defendant understands was filed under seal on September 17, 2021"). Given that Defendant does not object to the latter brief, the Court treats it as operative.

After Defendant filed her reply, Plaintiff moved for leave to file a surreply, which Defendant opposed.  *See* Pl.'s Mot. Leave to File Surreply, ECF No. 104; Def.'s Opp'n Pl.'s Mot. Leave to File Sur-Reply, ECF No. 107.  Although "surreplies are generally disfavored, . . . the determination of whether to grant or deny leave is entrusted to the sound discretion of the district court."  *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011), *aff'd*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012).  Here, the Court has reviewed the proposed

surreply and determined that it would have no effect on the Court's decision, and therefore its inclusion would not cause any harm to Defendant.  Plaintiff's motion for leave to file surreply is therefore granted.

### III.  LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  In considering a motion for summary judgment, a court cannot make credibility determinations or weigh the evidence.  *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  All underlying facts and inferences must be analyzed in the light most favorable to the non-movant.  *See Anderson*, 477 U.S. at 255. That said, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

Defendant moves to dismiss Plaintiff's three remaining claims: race-based discriminatory hostile work environment, gender-based hostile work environment, and retaliatory hostile work environment.[3]  As explained below, the Court holds that Defendant has not demonstrated entitlement to judgment as a matter of law on any of Plaintiff's claims, and therefore Defendant's motion for summary judgment is denied.[4]

To succeed on a discriminatory or retaliatory hostile work environment claim under Title VII, a plaintiff must show that the workplace was so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  Rather than cabin "conditions" to a narrow contractual definition, "the phrase 'terms, conditions, or privileges of employment' [of 42 U.S.C. § 2000e–2(a)(1)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *National R.R. Passenger*

---

[3] The Court's earlier opinion dismissed Plaintiff's "claim of race and sex discrimination" to the extent that it "does not present any unique facts or distinct legal theories."  *Allen*, 2019 WL 2581323, at *11.  The only other claims that survived the motion to dismiss were construed to be the three hostile-work-environment claims discussed herein.  Because Defendant moves for summary judgment "as to all of Plaintiff's claims," Mem. at 30, while presenting argument as to only the three hostile-work-environment claims, and because Plaintiff does not make any coherent attempt to explain "any unique facts or distinct legal theories" from those relevant to the hostile-work-environment claims, the Court considers Plaintiff to have conceded any claims other than the three hostile-work-environment claims.

[4] Defendant argues that Plaintiff is limited to a hostile work environment spanning 2008 to 2012.  Reply at 3–4.  Because including or excluding events outside this range would not affect the Court's holdings, it is not necessary to decide whether events outside that timeframe should be considered.  This issue should be dealt with in a focused motion *in limine* prior to trial.

*Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (cleaned up) (quoting *Harris*, 510 U.S. at 21).

However, this standard is not tantamount to a "general civility code" for the workplace.  *Vance v.*

*Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J., dissenting) (quoting *Oncale*, 523 U.S.

at 81).

      "To be actionable, charged behavior need not drive the victim from her job, but it must be

of such severity or pervasiveness as to pollute the working environment, thereby 'alter[ing] the

conditions of the victim's employment.'"  *Id.* (quoting *Harris*, 510 U.S. at 21–22).  "Whether a

work environment is objectively hostile ultimately depends on the particular acts 'taken as a

whole.'  'Very rarely will such fact-based determinations be appropriate for determination on

summary judgment,' particularly given that the Court is not permitted to weigh the evidence or

assess the credibility of witnesses."  *Coulibaly v. Pompeo*, No. 14-cv-712, 2020 WL 1536185, at

*4 (D.D.C. Mar. 31, 2020) (citations omitted) (quoting *Whorton v. Washington Metro. Area*

*Transit Auth.*, 924 F. Supp. 2d 334, 353 (D.D.C. 2013); *Armstrong v. Reno*, 172 F. Supp. 2d 11,

24 (D.D.C. 2001)).

      In its earlier opinion, the Court advised the parties that, "for each of these hostile work

environment claims, parties' future submissions must provide more analytically crisp arguments

that connect the alleged facts or rebuttals to each element of the hostile work environment legal

standard."  *Allen*, 2019 WL 2581323, at *1.  However, Defendant analyzes the two

discriminatory hostile-work-environment claims together except for the "because of" element,

and then incorporates those same arguments against Plaintiff's retaliatory hostile-work-

environment claim.  The Court will not tease out whether one claim fails the severe-or-pervasive

or corrective-action elements if Defendant declined to do so, and the Court once again

encourages the parties to clearly delineate their analyses claim-by-claim, including by specifying which facts support which elements of which legal theories.

## A. Discriminatory Hostile Work Environment

Regarding Plaintiff's discriminatory hostile-work-environment claims based on race discrimination and gender discrimination, Defendant argues that (1) Defendant did not subject Plaintiff to objectively severe or pervasive conduct, Mem. at 16–20; (2) the alleged hostile work environment was not based on Plaintiff's race, Mem. at 20–24; (3) the alleged hostile work environment was not based on Plaintiff's gender, Mem. at 24–25; and (4) Defendant took prompt and appropriate action in response to the conduct, Mem. at 25–27.

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'  . . .  When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris*, 510 U.S. at 21 (cleaned up) (quoting 42 U.S.C. § 2000e–2(a)(1); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

### 1. Severe or Pervasive

Defendant first argues that no reasonable jury could conclude that Defendant subjected Plaintiff to objectively severe or pervasive conduct.  Mem. at 16–20.  As explained above, the workplace must be so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale*, 523 U.S. at 78 (quoting *Harris*, 510 U.S. at 21).  "To

determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. "The key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003). The test has both subjective and objective dimensions: the plaintiff must "subjectively perceive the environment to be abusive" and the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21–22 (1993). Here, Defendant challenges only the objective component.

Defendant argues that, even with the facts viewed and inferences drawn in the light most favorable to Plaintiff, the sum of Wilson's actions were not objectively severe or pervasive enough to alter the conditions of Plaintiff's employment and create an abusive working environment. In Defendant's view, there was only one "objectively hostile" action by Wilson: kicking the trash can toward Plaintiff. Mem. at 18. The others—coughing, cane raising or "striking at" Plaintiff, staring menacingly, repeatedly walking by, entering rooms occupied by Plaintiff, issuing a vague threat if Plaintiff "tell[s] one more thing on me"—are, according to Defendant, not "objectively hostile." *See* Mem. at 18. One reason that Defendant views Wilson's conduct as insufficiently severe or pervasive is the timeline. "Plaintiff reports no encounters with Mr. Wilson for the . . . 39 months" between the trash-can incident in April 2008 and the coughing incident in July 2011, followed by Plaintiff and Wilson "f[inding] each other in the same place at the same time on three occasions" within "the next three months," "a chance encounter in February 2012," and "[t]he last episode . . . in July 2012." Mem. at 16–18.

Focusing heavily on the long gap between the trash-can incident and later incidents, Defendant argues that "the disconnected encounters . . . do not rise to the level of severe, pervasive, and abusive conduct."  Mem. at 20.  Defendant also argues in her reply that there was no meaningful effect on Plaintiff's work performance, which points against finding a sufficiently hostile work environment.  Reply at 8–9.

Defendant's argument on the "severe or pervasive" factor is an uphill climb given the trash-can incident, which Defendant candidly acknowledges was "inappropriate and aggressive," "objectively hostile," and made it "understandable that Plaintiff would want to be separated from Mr. Wilson."  Mem. at 16–18, 20.  Although this incident is not conclusive on its own, its severity and offensiveness are high given the specter of physical harm in the workplace.  It therefore weighs significantly against Defendant's argument that no reasonable jury could find severity or pervasiveness.

Additionally, although Defendant agrees that all facts and inferences must be viewed in the light most favorable to Plaintiff, Defendant's characterizations of Wilson's actions do not reflect that posture.  Defendant argues that "[t]he remaining isolated encounters" other than the trash-can incident "are more ambiguous, even under Plaintiff's interpretation."  Mem. at 18.  For example, Defendant argues that "the evidence does not support the inference that the cough was intentionally directed to Plaintiff, and Plaintiff does not even make that claim."  *Id.*  But, in Plaintiff's opposition, she quotes her deposition testimony as stating that Wilson "came over to [Plaintiff], from one side of the wall, and coughed in [Plaintiff's] face," and that afterward he had a "smirk on his face like he was relieved."  Opp'n at 29.  Plaintiff does not use the word "intentional," but such an accusation can be easily inferred from her testimony.

Similarly, regarding the cane incident, Defendant argues that "there is no evidence to support Plaintiff's interpretation of [Wilson's] movements . . . and Mr. Wilson professed to have reacted as part of an anxiety attack." Mem. at 18. But Plaintiff attached to her opposition a 2012 affidavit, appearing to have been signed by Plaintiff under penalty of perjury, in which she stated that "[w]hen Mr. Wilson looked in my direction he quickly began to approach me with a cane in his hand which he quickly raised upward and hit at me twice." Opp'n Ex. 3 at ECF p.9. Defendant included this same page in one of her exhibits. *See* Mem. Decl. Ex. 4 at ECF p.123, ECF No. 80-3. Plaintiff's interpretation of the events based on her personal observation is itself evidence.

Defendant also conspicuously ignores one of Plaintiff's more incendiary allegations, which is that Wilson used racial slurs in the workplace during the trash-can incident. Defendant does not address this allegation at all in her opening brief. In her reply brief, Defendant only mentions this allegation in the context of it being left out of police reports and earlier documentation of the trash-can incident as it relates to retaliation. *See* Reply at 13–15. It is not mentioned in the reply brief's discussion of the trash-can incident as it relates to whether there was severe or pervasive conduct. *See* Reply at 5–6. But Plaintiff produced deposition testimony of Foster, the colleague with whom Plaintiff was speaking during the trash-can incident, stating that Wilson was "shouting racial slurs like . . . 'kill the coon'" during or immediately after the trash-can incident. Opp'n Ex. 11 at 10:8–16; *see also* Opp'n at 9 ("In the absence of Plaintiff, who immediately ran out of the lab, Mr. Wilson yelled to Mrs. Foster 'Kill the Coon.'" (cleaned up)). Plaintiff's affidavit submitted with her Opposition states that she "was present . . . when Mrs. Foster told Mrs. Evans that Mr. Wilson" was yelling words like "kill the coon, shoot the coon." Opp'n Ex. 12 ¶ 6. Even if this was not said in Plaintiff's presence, her later knowledge

of the statement could contribute to a hostile work environment.  "When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005), *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007).  But, in this case, the statement was made immediately after Plaintiff left the room, Plaintiff learned about it the same day, and the statement was part of the course of action of Wilson kicking the trash can at Plaintiff, making this statement fairly connected to Plaintiff.

The cases cited by Defendant are not convincing because the conduct there was less severe.  For example, in *Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 104 (D.D.C. 2010), Defendant recounts that the plaintiff there alleged that he "was placed on administrative leave due to a false accusation, his accent was criticized, [and] he was told he was easy to replace with an American and that his supervisor would not hire other Africans."  Mem. at 20.  While odious, these alleged actions are less severe than experiencing instances of physical aggression in the workplace, as a reasonable jury could find here.

Although the events detailed by Plaintiff involve a large time period without incident and may not be the most severe conduct imaginable, Plaintiff has proffered enough evidence from which a reasonable jury could find severe or pervasive conduct sufficient to alter the terms and conditions of her employment.  The thrust of Defendant's argument is that Plaintiff's interpretation of events is incorrect, such as whether Wilson coughed intentionally onto Plaintiff or intentionally struck at Plaintiff with his cane.  But those questions are not suited for summary-judgment resolution.  Because the Court's role at this stage is merely to decide whether a reasonable jury could find severity or pervasiveness based on the evidence presented, the Court

holds that a reasonable jury could so find and therefore will not grant Defendant's motion for summary judgment on this ground.

### 2.  Based on Race

Defendant next argues that no reasonable jury could find that the allegedly hostile environment was because of Plaintiff's race.  "A plaintiff must . . . demonstrate that there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Román v. Castro*, 149 F. Supp. 3d 157, 170 (D.D.C. 2016) (internal quotation marks omitted).  In other words, as the Title VII statute puts it, the hostile environment must have been "because of" Plaintiff's race or sex.  42 U.S.C. § 2000e–2; *see also Coulibaly*, 2020 WL 1536185, at *4 ("[T]o prevail on a discriminatory or retaliatory hostile work environment claim, a plaintiff must show that he or she was harassed because of his or her protected status."); *Allen*, 2019 WL 2581323, at *10 ("Plaintiff must also establish that Defendant's alleged hostile work environment discrimination was *because of* the cited protected attribute in each instance.").

Defendant identifies four incidents upon which Plaintiff supposedly rests her argument of racial motivation for the hostile work environment: "(1) the April 2008 trash can incident; (2) Mr. Wilson's statement to Ms. Wright that 'no f*** way a Black man will become president;' (3) an allegation that Mr. Wilson visited the website of a white supremacist group; and (4) Jessica Gonzalez's testimony that she was a victim of Mr. Wilson's aggressive behavior."  Mem. at 21.  But Defendant does not examine all related facts for which Plaintiff has provided evidence and does not draw all inferences in favor of Plaintiff from those facts.  For example, as mentioned above, Defendant ignores deposition testimony provided by Plaintiff that Wilson used a racial slur in connection with the trash-can incident.  *See* Mem. Ex. 11 at 10:8–16.  Without taking that evidence into consideration, Defendant argues that "there is no basis to interpret the

2008 trash can incident as racially motivated." Mem. at 21. But without grappling with this evidence, Defendant's argument is not convincing.

As another example, Defendant seems to argue that "a June 4, 2008, incident in which Ms. Wright reported that she was alone with Mr. Wilson when he said in a loud tone that there was 'no f*** way' a black man would become President, while pounding his fist into his hand," Mem. at 21, is irrelevant to determining whether the hostile work environment was "because of" Plaintiff's race because Plaintiff was not present for the statement and the statement is not connected to Wilson's actions in later years, Mem. at 21. But Defendant misunderstands the proper inquiry. Plaintiff must show "some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Román*, 149 F. Supp. 3d at 170. The workplace must be so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale*, 523 U.S. at 78 (quoting *Harris*, 510 U.S. at 21). These formulations do not require that racially discriminatory statements be made directly to Plaintiff. Absent authority to the contrary, a workplace can been permeated with discriminatory intimidation, ridicule, and insult such that it alters the conditions of a plaintiff's employment even if discriminatory statements are not made directly to the plaintiff or specifically concern the plaintiff. *See* Reply at 10 ("While a plaintiff does not need to witness harassment in order for the court to consider it as part of the totality of the circumstances, the plaintiff 'does need to know about it.'" (quoting *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012)). Here, Plaintiff's affidavit states that she attended a meeting between Wright and Evans at which Wright conveyed Wilson's statement. Mem. Ex. 12 at 3. Plaintiff's learning of Defendant's statement could certainly contribute to an environment of discriminatory intimidation, ridicule,

and insult because it could be interpreted as disparaging or intimidating to the race to which

Plaintiff identifies.  Moreover, even if the comment was not directed at Plaintiff, it certainly is

indicative of the motivation Wilson had in taking the actions he took against Plaintiff.

Defendant also argues that "overwhelming evidence" shows that Wilson's "occasional

outbursts, political rants, and demonstrations of anger were a regular part of his character in the

workplace," as opposed to being "based on a discriminatory animus against black people or

women."  Mem. at 22–23.  But, as explained above, the issue for a hostile-work-environment

claim is not solely whether Wilson personally intended to discriminate; the issue is whether an

abusive work environment was created because it was sufficiently "permeated with

discriminatory intimidation, ridicule, and insult."  *Oncale*, 523 U.S. at 78.  There is evidence that

Wilson used racially discriminatory language more than once, and this is enough to survive

summary judgment on the "because of" element.  Furthermore, even if the relevant question was

Wilson's intent, summary judgment is not the appropriate vehicle for evaluating competing

evidence unless the evidence on the non-movant's side is so slight that it could not support a

finding by a reasonable jury.  Here, Defendant presents evidence that Wilson was generally

excitable, easily frustrated, and angry unrelated to any discriminatory animus, including

declarations from co-workers stating that Wilson got along well with Black individuals and that

the declarants had not witnessed discrimination from Wilson.  But it is a jury's job to weigh this

evidence against evidence to the contrary, including Wilson's race-related language.

### 3.  Based on Gender

Defendant spends less than a page of her brief and less than half a page of her reply

arguing that there is insufficient evidence from which a reasonable jury could find that the

allegedly hostile environment was because of Plaintiff's sex or gender, with essentially no

citation to the record beyond citing all of Plaintiff's interrogatory responses generally. *See* Mem. at 24–25; Reply at 11–12. In its earlier opinion, the Court cautioned "that Plaintiff must more crisply differentiate her claim for race-based discrimination from her claim for sex/gender-based discrimination to clarify how each of her factual allegations connects to each of these distinct theories of hostile work environment discrimination. Plaintiff must also establish that Defendant's alleged hostile work environment discrimination was *because of* the cited protected attribute in each instance." *Allen*, 2019 WL 2581323, at *10. However, that goes for Defendant as well because it is Defendant's burden as movant to demonstrate that she is entitled to judgment as a matter of law.

Defendant does not discuss in any detail the allegations that the Court recounted in its earlier opinion regarding sex or gender discrimination. In that opinion, the Court listed allegations that Defendant treated Plaintiff differently than it treated a white male employee who Wilson also attempted to strike with his cane by permitting only the white male employee to stop working alongside Wilson and not accusing the white male employee of lying about the attack. *Allen*, 2019 WL 2581323, at *9. The Court also noted the allegation "that only black, female employees were asked to perform an office clean-up." *Id.* Plaintiff presents at least minimal evidence supporting these allegations. *See Allen*, 2019 WL 2581323, at *9 (referring to attachment to complaint containing "statement from the white male employee suggesting that he, unlike Ms. Allen, was permitted to stop working alongside Mr. Wilson in the wake of his incident"); Opp'n at 41 ("In contrast neither Mr. Cloth nor Mr. Kipperman was accused of lying."); Opp'n Ex. 3 at ECF p.195 (memorandum stating that "Allen allegedly reported to being physically assaulted by Wilson to Zachary Henderson," but that "Henderson alleged Allen later reported Wilson did not strike her, but raised his cane in a threatening manner"); Opp'n at 36

(citing coworker's statement that Plaintiff did not accuse Wilson of striking her, but merely striking *at* her); Opp'n at 28 ("For a Clean Up Detail, on June 23, 2008, not part of Plaintiff's job description, Mrs. Evan[s] initially selected only the three Black Female employees who had previously filed Claims against Mr. Wilson." (citing Opp'n Ex. 1 at ECF p.106)).[5]

Despite the Court listing these allegations and Plaintiff citing relevant evidence (albeit confusingly and obliquely), Defendant argues that "Plaintiff has not identified any statements or conduct by Defendant that gives rise to an inference that she was subjected to discrimination because she is a woman" and that "Defendant is unaware of any evidence in the voluminous record to suggest that Mr. Wilson's behavior might have been motivated because Plaintiff is female," in part because Evans is a woman. Mem. at 24–25; Reply at 11. Neither Defendant's opening brief nor reply address these allegations with respect to whether the alleged hostile work environment was because of Plaintiff's gender. Defendant's only attempt to cite the record to establish a lack of genuinely disputed material fact is general citation to Plaintiff's interrogatory responses. *See* Mem. at 24. This is insufficiently particularized to support Defendant's argument. Although Plaintiff's evidence does not appear, on its face, to be particularly strong or definitive, the Court is not willing to pass on its sufficiency without particularized argument from Defendant. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

---

[5] The declaration supporting the allegation that only Black, female employees were selected for the office clean-up itself states that the participants were told that other employees would also be participating. *See* Opp'n Ex. 1 at ECF p.106, ECF No. 83-8. But this contrary evidence does not completely undermine an inference of gender-based discrimination such that summary judgment would be appropriate.

fact."); *cf. Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).  Defendant may end up being correct, but that has not been demonstrated here.[6]

### 4.  Prompt and Appropriate Action

Finally, Defendant argues that she implemented prompt and appropriate corrective action. *See* Mem. at 25–27.  "An employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."  *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999); *see also Coulibaly*, 2020 WL 1536185, at *5 ("[T]his element applies only to cases involving harassment by co-workers—that is, situations in which the employer is not directly responsible, but could be vicariously liable.").

Defendant recounts the actions taken by Defendant in response to various incidents but offers only conclusory argument that those actions were prompt and appropriate.  *See* Mem. at 25–27.  No factual comparisons are made to past cases to convince the Court that the actions taken here were "prompt and appropriate."  Additionally, Defendant fails to grapple with evidence presented by Plaintiff that Defendant's corrective actions were inappropriate.  For example, Defendant does not address Plaintiff's statement in her affidavit that when Plaintiff and Foster reported the trash-can incident to Evans, including Foster relaying that Wilson used words like "kill the coon," Evans replied that "Foster must have misunderstood what Mr. Wilson yelled

---

[6] Similarly, as mentioned above, it may turn out that the alleged hostile work environment based on gender is not sufficiently severe or pervasive.  But the Court will not address that narrow question when Defendant did not differentiate between the various bases for hostile work environment in her argument regarding severity or pervasiveness.

and asked Mrs. Foster [if] she [was] sure." Opp'n Ex. 12 ¶¶ 6–9.  Defendant also does not

address Foster's deposition testimony that Evans said that their filing of a complaint "would

make things difficult on [them]."  Opp'n Ex. 11 at 12:7–12.  Plaintiff makes additional argument

against summary judgment on this ground, but it does not need to be addressed because

Defendant's lack of authority and failure to address contrary evidence is sufficient to deny

summary judgment on corrective action.

### B.  Retaliatory Hostile Work Environment

Regarding Plaintiff's retaliatory hostile-work-environment claim, Defendant

(1) incorporates her first and third arguments above regarding the severity or pervasiveness of

the conduct and Defendant's remedial actions; and (2) argues that neither fact nor law support

Plaintiff's theory that Evans retaliated against Plaintiff by "intentionally allow[ing] Mr. Wilson

to allegedly harass and engage in 'violence' against Plaintiff."  Mem. at 2, 27–30.  The Court

will not grant Defendant's motion on this first ground because the Court already rejected that

theory above regarding Plaintiff's discriminatory hostile-work-environment claims and

Defendant does not advance a different argument on that ground.  *See* Mem. at 28 (incorporating

arguments on "severe or pervasive" and "appropriately addressed" elements of discriminatory

hostile-work-environment claim "[g]iven the overlapping elements of the claims").  For the

reasons below, the Court will also not grant Defendant's motion on the second ground.

The antiretaliation provision of Title VII "[p]rohibits an employer from 'discriminat[ing]

against' an employee or job applicant because that individual 'opposed any practice' made

unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII

proceeding or investigation."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006)

(quoting 42 U.S.C. § 2000e–3(a)).  This Court has previously explained that most courts have

interpreted "discriminatory intimidation," which is the phrase used in *Baird v. Gotbaum* ("*Baird I*"), 662 F.3d 1246, 1250 (D.C. Cir. 2011), for the retaliatory hostile-work-environment standard, "as requiring a demonstration of *retaliatory*, rather than discriminatory, intimidation—that is, intimidation based on the employee's participation in protected activity rather than her membership in a protected class." *Román*, 149 F. Supp. 3d at 166. Defendant does not dispute that this is the appropriate inquiry. *See* Mem. at 27–28.

"To prove retaliation, a plaintiff must show that '(1) [she] engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action.'" *Baird v. Gotbaum* ("*Baird II*"), 792 F.3d 166, 168 (D.C. Cir. 2015) (quoting *Hairston v. Vance–Cooks*, 773 F.3d 266, 275 (D.C. Cir. 2014)). The adverse action must be "material," meaning "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington N.*, 548 U.S. at 68, 57). "This Circuit has recognized that a hostile work environment can constitute a materially adverse action for retaliation claims." *Chan Chan v. Children's Nat'l Med. Ctr.*, No. 18-cv-2102, 2019 WL 4471789, at *8 (D.D.C. Sept. 18, 2019). In its earlier opinion, the Court explained the type of conduct that could constitute a retaliatory hostile work environment:

> In a retaliatory hostile work environment claim, a plaintiff argues that the "cumulative effect," *see Nat'l R.R. Passenger Corp.*, 536 U.S. at 115, of "adequately linked" acts amount to a "coherent hostile environment claim." *Baird II*, 792 F.3d at 168 (citing *Baird I*, 662 F.3d at 1251). To be adequately linked, such acts might, for example, "involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers." *Id.* (citing *Baird I*, 662 F.3d at 1251 (alterations omitted)).

*Allen*, 2019 WL 2581323, at *8. The conduct must also, of course, be sufficiently severe or pervasive, as discussed above. *Id.*

23

It is not perfectly clear which element of the retaliatory hostile-work-environment test Defendant contends that Plaintiff fails.  Defendant argues that neither fact nor law support Plaintiff's theory that Evans retaliated against Plaintiff by "intentionally allow[ing] Mr. Wilson to allegedly harass and engage in 'violence' against Plaintiff."  Mem. at 2, 27–30.  But Defendant cites no case law in her opening brief on this issue except to state the rule that retaliatory intimidation must be shown in a retaliatory hostile-work-environment claim.  Mem. at 28.  The most likely candidate seems to be a largely factual argument regarding the requirement that there be "a causal link between the protected activity and the adverse action."  *Baird II*, 792 F.3d at 168.  Because "Defendant understands Plaintiff's retaliatory hostile work environment claim to be based on Mr. Wilson's conduct" and Evans's encouragement of that behavior, Mem. at 28, Defendant seems to be arguing that there is insufficient evidence from which a reasonable jury could find that either Wilson's harassing conduct was caused by Plaintiff filing EEO complaints or that Evans encouraged Wilson's harassing conduct due to Plaintiff filing EEO complaints.

Defendant's primary argument is therefore that no evidence shows that "Evans worked in concert with Mr. Wilson to create fear or anxiety in Plaintiff."  Mem. at 28.  Relatedly, Defendant highlights the corrective actions taken by Evans and BEP as evidence contrary to the allegation that Evans encouraged Wilson's behavior, arguing that if Evans wanted to retaliate, she could have instead shielded Wilson from consequences.  *See* Mem. at 28–29.  Defendant also argues that the facts do not support the conclusion that Evans encouraged Wilson to harass Plaintiff because "Wilson did not seek the encounters with Plaintiff about which [Plaintiff] complains."  Mem. at 29.  Last, Defendant argues that, even if Evans orchestrated Wilson's alleged harassment of Plaintiff, no evidence supports the conclusion that Evans's actions were

undertaken because of Plaintiff's protected activity.  *See id.*  In support, Defendant lists EEO complaints filed by Plaintiff in 2003 (white male employee at higher pay level), 2008 (trash-can incident), 2009 (promotion), 2011 (coughing incident), and 2012 (elevator incident), and argues that "Plaintiff has not articulated a plausible theory to establish causation, and Defendant cannot conceive of a fact-based argument" meeting causation.  *Id.*

Defendant's motion fails on this ground at least because it does not address certain allegations of retaliation despite moving for summary judgment on the entire retaliatory hostile-work-environment claim.  In its earlier opinion, the Court held that Plaintiff had plausibly stated a claim for retaliatory hostile work environment based on allegations that Plaintiff "engaged in a statutorily protected activity by filing EEOC complaints" and that BEP retaliated by (1) failing to adjust her workplace conditions or remove her from Wilson's proximity, including the VIT's refusal and failure to investigate her claims, (2) assigning her to a clean-up, and (3) falsely claiming that she lied about being struck by Wilson.  *Allen*, 2019 WL 2581323, at *9.  Despite the Court identifying these as relevant allegations, Defendant says that she "understands Plaintiff's retaliatory hostile work environment claim to be based on Mr. Wilson's conduct, with the additional feature that Ms. Evans allegedly encouraged or provoked that behavior to retaliate against Plaintiff for prior EEO activity and because she allegedly was 'friends' with Mr. Wilson."  Mem. at 28.  In support of this narrower scope, Defendant cites Plaintiff's response to interrogatory number 5 as stating: "I am certain that Ms. Evans retaliated against me through Mr. Andrew Wilson.  My Supervisor, Julie Evans, used Mr. Wilson as her Pitbull to harass me."  *Id.*  On its face, this statement does not foreclose other forms of retaliation.  Turning to the interrogatory responses attached to Defendant's memorandum themselves to further understand the context, Plaintiff's response to interrogatory number 5 contains the text quoted by Defendant,

but also a reference to "the fact[s] in my Amended Complaint, Doc 12, Count One, paragraph 60 to 74." Mem. Ex. A at 16. The cited paragraphs contain allegations that the VIT—not just Evans—retaliated against Plaintiff. *See, e.g.*, Am. Compl. ¶¶ 63–64.

Additionally, Plaintiff's response to interrogatory number 6 first cross-references Plaintiff's response to interrogatory number 5 and then describes both Evans assigning Plaintiff and other "employees who complained about Mr. Wilson's workplace violence" to "work outside of [her] employment duties" and Plaintiff being accused of lying. *See* Mem. Ex. A at 17–18. This interrogatory called for the factual basis for the allegation that BEP used Wilson to retaliate against Plaintiff, but the inclusion of these facts indicates Plaintiff's intention to rely on them to support her retaliatory hostile-work-environment claim absent, for example, earlier motions practice to strike irrelevant responses. Similarly, if Defendant wishes to use Plaintiff's failure to raise facts or arguments in her interrogatory responses to narrow the scope of Plaintiff's claims, Defendant must make that argument clearly and with citation to authority, not vaguely by reference to how Defendant "understands" Plaintiff's claims. Although Plaintiff's opposition is disorganized and difficult to decipher, it is the movant's burden on summary judgment to point out the parts of the record that demonstrate an absence of disputed material fact such that the movant is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment *if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (emphasis added)); *see also* Fed. R. Civ. P. 56(c). Defendant's narrow focus precludes summary judgment here.

Defendant fails to cite authority to support its other arguments and some of those arguments run counter to the summary judgment standard. For example, Defendant argues in her reply that the fact that Evans and Wilson were allegedly smiling when Wilson apologized to

Plaintiff "is far from sufficient to support a theory for retaliation." Reply at 12. But no analogous cases are cited to support this proposition. It is also unclear why Defendant only addressed this relevant allegation in reply when Plaintiff had referenced it in her interrogatory responses. *See* Mem. Ex. A at 5 ("Ms. Julie Evans . . . ask[ed] Mr. Wilson to apologize for his attempted physical assault and battery on my person. Mr. Wilson apologized in the presence of Ms. Evans, while looking at me and Ms. Evans smiling as if he were a mad person. I then realized that Mr. Wilson intended to harm me and that Ms. Evans did not take the matter seriously."). Defendant even stated in her opening brief that "Plaintiff has not articulated any facts to support a finding that Ms. Evans worked in concert with Mr. Wilson to create fear or anxiety in Plaintiff." Mem. at 28. Defendant may believe that Plaintiff's recollection of Evans and Wilson smiling is incorrect or insufficient, and Defendant could ultimately be correct, but it is incorrect to claim that Plaintiff has not even articulated *any* such facts.

Evans imposing punishment on Wilson is certainly some evidence counter to Plaintiff's theory, but it is not appropriate for the Court to weigh this evidence on summary judgment. Defendant also argues that "[t]he 'pitbull' theory makes no sense because, even under Plaintiff's version, Mr. Wilson did not seek the encounters with Plaintiff about which she complains." Mem. at 29. Even if Defendant were correct that it was undisputed that Wilson did not seek any of the encounters with Plaintiff, it is not clear why that is relevant given Plaintiff's allegations that Wilson's actions toward Plaintiff were intentional, even if they were undertaken without strict timelines or planned in advance. Also regarding timelines, Defendant argues that Plaintiff has failed to show causation linking Evans's conduct to Plaintiff's protected activity. *Id.* Although Defendant cites the dates of Plaintiff's EEO complaints, Defendant does not make a clear argument regarding timing. Perhaps Defendant is arguing that there is no evidence of

retaliatory intent nor sufficiently close temporal proximity to establish the required causal link.
*See Román*, 149 F. Supp. 3d at 169 ("In the absence of direct evidence of retaliatory intent, a
causal relationship between protected activity and adverse actions by an employer may be
inferred through either temporal proximity or the existence of a pattern of antagonism.").  But
Defendant does not cite any authority regarding temporal proximity, much less in the context of
a retaliatory hostile work environment where retaliatory acts may play out over a longer time
span than discrete claims of retaliation.

Defendant's arguments in reply regarding Plaintiff's supposed "new arguments" cannot
salvage the motion regarding the retaliatory hostile-work-environment claim.  Reply at 12.
Defendant argues against Plaintiff's reliance on certain evidence of retaliation, including
evidence of Evans coercing Plaintiff and Foster not to report Wilson's race-related statements
and Evans's failure to include those statements in a memorandum.  *See* Reply at 13–15.  But it is
unnecessary to consider these arguments because Plaintiff's claim survives regardless.
Defendant argues that Plaintiff fails to identify the protected activity that allegedly caused the
retaliation of Plaintiff being forced to work "within striking distance" of Wilson in 2011.  *See*
Reply at 15–16.  But Defendant herself identifies at least one EEO complaint about Wilson made
before this: the complaint in 2008 about the trash-can incident.  *Id.* at 15.  Merely stating that
Plaintiff failed to identify the relevant protected activity cannot, without more, justify summary
judgment.  Defendant's arguments regarding the officer allegedly falsely accusing Plaintiff of
lying and retaliation from the VIT will not be considered for the first time in reply after
Defendant's failure to raise them in her opening brief after the Court specifically referred to
these allegations in its prior opinion.  *Allen*, 2019 WL 2581323, at *9; *see Walker v. Pharm.
Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006) (waiving argument raised

for the first time in reply).  Even if the Court were to consider these arguments, Defendant does not cite any cases in her discussion to support her arguments except concerning exhaustion of administrative remedies, and that argument appears underdeveloped due to a lack of citation to the relevant EEO complaint.  Based on the Court's application of the relevant legal principles to the arguments and evidence presented by the parties, Plaintiff's claims survive in their entirety.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 80) is **DENIED** and Plaintiff's motion for leave to file surreply (ECF No. 104) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 14, 2022                                      RUDOLPH CONTRERAS
                                                              United States District Judge