**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PATRICIA A. ALLEN, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-1214 (RC) |
| | : | | |
| v. | : | Re Document No.: | 187 |
| | : | | |
| JANET YELLEN, Secretary of the Treasury, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, FOR A NEW TRIAL**

## I. INTRODUCTION

Plaintiff Patricia Allen, an African-American woman, brought this employment discrimination action against Janet Yellen, the Secretary of the Treasury, in her official capacity. Ms. Allen alleged that her employer, the United States Bureau of Engraving and Printing (the "Bureau"), subjected her to a hostile work environment based on race, gender, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, due to the behavior of a white coworker, Andrew Wilson, and the Bureau's related response. After an eight-day trial, the jury returned a unanimous verdict in favor of the government on all three (*i.e.*, race, gender, and retaliation) counts. Ms. Allen now moves for judgment as a matter of law or, in the alternative, for a new trial. This is a high bar. Because the jury had ample grounds at trial to find that Ms. Allen did not meet her burden of proof, the Court will deny Ms. Allen's motion.

## II.  LEGAL STANDARD

### A.  Renewed Motion for Judgment as a Matter of Law

In ruling on a Rule 50(b) motion, the Court "do[es] not . . . lightly disturb a jury verdict." *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015) (ellipsis in original) (quoting *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007)); *see also Breeden v. Novartis Pharm. Corp.*, 646 F.3d 43, 53 (D.C. Cir. 2011) ("[J]udgment as a matter of law is 'highly disfavored' because it 'intrudes upon the rightful province of the jury'" (quoting *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994))).  The Court must resolve all reasonable inferences in the nonmovant's favor.  *See Breeden*, 646 F.3d at 53.  The Court cannot substitute its view for the jury's view, assess witnesses' credibility, or weigh the evidence.  *See Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996).  And "[e]ven if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law."  *Pitt v. District of Columbia*, 558 F. Supp. 2d 11, 15–16 (D.D.C. 2008) (citing 9 Moore's Federal Practice § 50.60[1] at 50–87 (3d ed. 2002)).  The jury's verdict will stand if the evidence in support is "'significantly probative' and 'more than merely colorable.'"  *Scott*, 101 F.3d at 753 (quoting *Ferguson v. F.R. Winkler GMBH & Co. KG*, 79 F.3d 1221, 1224 (D.C. Cir. 1996)).  In other words, "[j]udgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in [defendant's] favor."  *Muldrow*, 493 F.3d at 165 (quoting *McGill v. Muñoz*, 203 F.3d 843, 845 (D.C. Cir. 2000)).[1]

---

[1] A post-trial motion for judgment as a matter of law may be granted only upon grounds advanced in a pre-verdict motion; that is, a movant who omits a theory from a pre-verdict Rule 50 motion waives the theory as a basis of its post-verdict renewal.  *See Campbell v. District of*

### B.  Motion for a New Trial

A district court "may . . . grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  This rule commits the decision whether to order a new trial to the court's discretion; it generally means that a court "should grant a new trial if the verdict is against the weight of the evidence, damages are excessive, for other reasons the trial was not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions."  *Klayman v. Judical Watch, Inc.*, No. 6-cv-670, 2019 WL 1244079, at *5 (D.D.C. Mar. 18, 2019) (citation omitted), *aff'd*, 6 F.4th 1301 (D.C. Cir. 2021).  The court should exercise its discretion to order a new trial "sparingly and cautiously" because it "should be mindful of the jury's special function in our legal system and hesitate to disturb its finding."  *Id.* (citations omitted).  Also guiding the court's discretion is the "well-settled principle that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple."  *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015) (internal quotation marks and citation omitted).  Thus, the court should grant a new trial "only where [it] is *convinced* the jury verdict was a seriously erroneous result and where denial of the motion will result in a 'clear miscarriage of justice.'"  *Klayman*, 2019 WL 1244079, at *5 (internal quotation marks and citation omitted) (emphasis in original).  All of this means that "[t]he jury verdict stands 'unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that

---

*Columbia*, 894 F.3d 281, 286 (D.C. Cir. 2018).  Here, Ms. Allen's counsel moved for a directed verdict at the close of evidence but did not advance any theories or arguments.  Tr. at 1166:8–14. Nonetheless, "in the interest of reaching any necessary issues and conclusively resolving this case," the Court will consider Ms. Allen's post-verdict motion for a judgment as a matter of law. *Klayman*, 2019 WL 1244079, at *6.

reasonable men and women could not disagree on the verdict.'" *Id.* (quoting *Czekalski v. LaHood*, 589 F.3d 449, 456 (D.C. Cir. 2009)).

## III.  ANALYSIS

To succeed on a discriminatory or retaliatory hostile work environment claim under Title VII, a plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  Rather than cabin "conditions" to a narrow contractual definition, "the phrase 'terms, conditions, or privileges of employment' [of 42 U.S.C. § 2000e–2(a)(1)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (cleaned up) (quoting *Harris*, 510 U.S. at 21).  However, this standard is not tantamount to a "general civility code" for the workplace.  *Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J., dissenting) (quoting *Oncale*, 523 U.S. at 81).

"To be actionable, charged behavior need not drive the victim from her job, but it must be of such severity or pervasiveness as to pollute the working environment, thereby 'alter[ing] the conditions of the victim's employment.'" *Id.* (quoting *Harris*, 510 U.S. at 21–22).  "Whether a work environment is objectively hostile ultimately depends on the particular acts 'taken as a whole.'" *Coulibaly v. Pompeo*, No. 14-cv-712, 2020 WL 1536185, at *4 (D.D.C. Mar. 31, 2020) (citations omitted) (quoting *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 353 (D.D.C. 2013); *see also Armstrong v. Reno*, 172 F. Supp. 2d 11, 24 (D.D.C. 2001)).

In this case, the jury reasonably concluded that Ms. Allen had failed to meet her burden to show that she was entitled to relief on any of her claims.  Because that is the case, neither judgment as a matter of law nor a new trial is justified.  Ms. Allen's briefing appears to fundamentally misunderstand the governing standards under Rule 50(b) and Rule 59(a).  *See generally* Pl.'s Mem. in Support of Am. Mot. for a Direct Verdict as a Matter of Law Alternative for a New Trial Under Fed. R. Civ. P., Rule 50(a) and 50(b) and Rule 59 ("Pl.'s Mot."), ECF No. 187.  Her motion "mentions 'credibility dispute' or 'credibility contest' eleven times."  Def.'s Opp'n to Pl.'s Mot. for J. as a Matter of Law or, in the Alternative, for a New Trial ("Def.'s Opp'n") at 9, ECF No. 192 (citing Pl.'s Mot. at 15, 16, 35, 36, 38, 39, 42, 43, 56)).  But it is blackletter law that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Martinez v. District of Columbia*, 503 F. Supp. 2d 353, 357 (D.D.C. 2007) (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150–51 (2000)).  The question before the Court is not whether the Court would weigh the evidence differently.  *See Scott*, 101 F.3d at 753 (explaining that "the court cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence"); *Ames v. Nielsen*, No. 13-cv-01054, 2018 WL 5777391, at *1 (D.D.C. Nov. 2, 2018) (denying a plaintiff's Rule 50 motion in Title VII case where "her entire argument is premised on the credibility of various players involved"), *aff'd sub nom.*, *Ames v. Wolf*, 820 F. App'x 1 (D.C. Cir. 2020).  Instead, the jury's verdict must stand unless "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that

reasonable men and women could not have reached a verdict in [defendant's] favor." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010).[2]

The Court will analyze Ms. Allen's hostile work environment claims in the following order: race, gender, and retaliation.[3]  The jury reasonably concluded that Ms. Allen did not meet her burden to establish relief under any of these claims.

## A.  Discriminatory Hostile Work Environment Based on Race

To prevail on this claim, "[a] plaintiff must . . . demonstrate that there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."  *Román v. Castro*, 149 F. Supp. 3d 157, 170 (D.D.C. 2016) (internal quotation marks omitted).  In other words, as the Title VII statute puts it, the hostile environment must have been "because of" Plaintiff's race.  42 U.S.C. § 2000e–2; *see also Coulibaly*, 2020 WL 1536185, at *4 ("[T]o prevail on a discriminatory or retaliatory hostile work environment claim, a plaintiff must show that he or she was harassed because of his or her protected status."); *Allen v. Mnuchin*, No. 18-cv-1214, 2019 WL 2581323, at *10 ("Plaintiff must also establish that Defendant's alleged

---

[2] In her reply brief, Ms. Allen argues that the Bureau's alleged failure to completely investigate Ms. Allen's complaints "deprived Plaintiff of the evidence needed for a favorable jury verdict."  Pl.'s Response to Def.'s Opp'n ("Pl.'s Reply") at 5, ECF No. 193; *see id.* at 8 ("Defendant deprived Plaintiff of an Equal Employment Opportunity to an investigation of her harassment claims against her harasser").  This argument is puzzling for a number of reasons.  First, it suggests that Ms. Allen's evidence at trial was *insufficient* to render a verdict in her favor—but this directly undermines Ms. Allen's motion.  Second, Ms. Allen overlooks the fact that her testimony at trial was itself evidence, as well as testimony about any purported failure to investigate by the Bureau, and that the jury considered the credibility of these allegations in assessing Ms. Allen's claims.

[3] Ms. Allen followed her motion by filing a "List of undisputed facts and party admissions in support of motion" ECF No. 188 at 1.  The Court declines to consider this document, which is not only inappropriate at this stage but also an improper attempt to bypass her brief's 45-page limit.  *See* Min. Order (Dec. 15, 2022); LCvR 7(e).  The Court also declines to consider Ms. Allen's revised reply brief, ECF No. 194, which was filed without permission of the Court.  The Court ran a redline and is satisfied that none of the minor edits in the revised reply brief would alter the Court's analysis.

hostile work environment discrimination was *because of* the cited protected attribute in each instance.") (emphasis in original).

### 1. Mr. Wilson's Behavior

At trial, Ms. Allen introduced several witnesses (including herself) to describe the racial hostile work environment she allegedly experienced due to her co-worker, Mr. Wilson. The government presented a different theory to the jury: it argued that Mr. Wilson's behavior was motivated by politics, not race. The Court will proceed to describe the numerous incidents Ms. Allen highlighted at trial involving Mr. Wilson, organized roughly by chronological order.

Ms. Allen's case relied heavily on an April 30, 2008 incident—known as the "trash can incident"—involving Mr. Wilson, an African-American female co-worker named Sireda Foster, and herself. Ms. Allen testified that on that day, she and Ms. Foster were at the Bureau watching CNN news during their break time. Tr. at 796:2–5. Mr. Wilson was also in the room, but their backs were turned away from him. *Id.* at 796:6. Ms. Allen made a comment about high gas and food prices and the need to get Republicans out of office. *Id.* at 796:6–11. All of a sudden, she felt a trash can coming toward her. *Id.* at 796:12–13. Turning around, she discovered that Mr. Wilson had thrown or kicked the trash can in her direction. *Id.* at 796:12–17, 81:6–13.[4] Frightened, Ms. Allen left the room and tried to call her supervisor, Julie Evans, for help. *Id.* at 796:18–22. Moments later, Ms. Foster found Ms. Allen on a different floor of the building; Ms. Foster, too, appeared upset. *Id.* at 797:12–15. She told Ms. Allen that after Ms. Allen had left the room, Mr. Wilson said to Ms. Foster, "[k]ill the coon." *Id.*; *see id.* at 53:1–23. According to

---

[4] On direct examination, Ms. Allen testified that Mr. Wilson threw the trash can toward her. *Id.* at 796:16–17. On cross-examination, however, she admitted that in a September 17, 2008 EEO complaint she stated that Mr. Wilson kicked the trash can toward her chair. *Id.* at 835:11–16. Ms. Allen's counsel has since described Mr. Wilson's action as a kick. *See id.* at 1236:12–13; Pl.'s Reply at 10.

Ms. Allen, this racial slur means "kill Black people."  *Id.* at 797:12–15; *see also id.* at 55:22–24

(Ms. Foster testifying that this phrase is equivalent to "kill the [N-word]").

At trial, the government conceded that Mr. Wilson's behavior with respect to the trash

can was inappropriate, but it contested whether Mr. Wilson had uttered the racial slur.  A

reasonable jury could conclude from the conflicting evidence in the record that Mr. Wilson did

not utter the phrase, "[k]ill the coon."  The government impeached both Ms. Allen and Ms.

Foster's testimony on this point by showing the jury that both of them made statements under

oath prior to trial that never mentioned Mr. Wilson uttering the racial slur.  For example, on

cross-examination, Ms. Foster admitted that the voluntary statement she gave to agency police

officer Donald Snow immediately after the incident never mentioned Mr. Wilson's alleged racial

slur.  *Id.* at 84:8–13.  Nor did Ms. Foster mention the racial slur in her EEO declaration that she

submitted six months after the incident, *id.* at 84:17–87:22, or in her EEO declaration dated

January 13, 2012, *id.* at 88:15–89:10.  In her 2012 EEO declaration, Ms. Foster responded "no"

to the question, "Have you ever personally witnessed [or] overheard Mr. Wilson making any

derogatory comments and/or verbally threaten the Complainant [Ms. Allen] in any way

concerning her race, sex or creating a hostile work environment for the Complainant?  If yes,

when (dates), what happen[ed] and what was said?"  *Id.* at 89:25–90:8.  And in 2020, Ms. Foster

was asked at the beginning of her deposition whether she wanted to change anything in her

voluntary statement or her EEO declarations, and she said no.  *Id.* at 97:10–98:14.

Ms. Foster told the jury that she did not mention the alleged racial slur in her voluntary

statement for fear of losing her job.  *See id.* at 96:7–11.  According to Ms. Foster, when she told

Ms. Evans about the racial slur, Ms. Evans threatened that reporting the incident would "make

things hard" for Ms. Foster.  *Id.*.[5]  But the government pointed out that this reasoning would not explain why Ms. Foster continued to leave the alleged racial slur out of her subsequent sworn statements.  Ms. Foster told the jury that in 2009, she moved to a different department within the Bureau and stopped working under Ms. Evans, and that by 2015, Ms. Foster had left the Bureau altogether to work for the FDA.  *Id.* at 75:15–77:17.  The jury could reasonably conclude that Ms. Foster's previous statements were true and that her alleged fear of reprisal was not.

Likewise, the jury could have discredited Ms. Allen's testimony on the same basis.  As with Ms. Foster, Ms. Allen claimed that she feared for her job and therefore did not mention the alleged racial slur in her voluntary statement or subsequent EEO declarations.  *Id.* at 798:1–10.  But on cross-examination, Ms. Allen acknowledged that her First Amended Complaint, filed in this Court in late 2018, still did not mention the racial slur.  *Id.* at 840:4–841:13.  Neither Ms. Allen's interrogatory responses, *id.* at 841:14–842:21, nor her deposition in 2020, *id.* at 843:18–845:10, mentioned it, either.  As the government pointed out in its closing, the first time Ms. Allen ever claimed Mr. Wilson uttered the racial slur was in 2021, seven months after Ms. Foster's deposition and over 12 years after the trash can incident.  *Id.* at 1275:3–11.

In addition, the jury could have reasonably credited Mr. Snow's testimony, which contradicted Ms. Allen and Ms. Foster's testimony.  Mr. Snow has served as a police officer at the Bureau for over twenty years.  *Id.* at 164:7–15.  When the trash can incident occurred, the Bureau dispatched Mr. Snow to the scene.  *Id.* at 166:16–25.  Prior to this moment, he had no interactions with Ms. Allen, Ms. Foster, or Mr. Wilson besides exchanging greetings or

---

[5] Ms. Foster claimed that after the trash can incident, she first went to find Ms. Evans but could not find her.  *Id.* at 95:5–96:18.  Then she went to the police, who told her that she needed to speak with her supervisor first.  *Id.*  She then spoke with Ms. Evans before giving the voluntary statement to the police.  *Id.*  The jury could have questioned Ms. Foster's account of this sequence of events, in light of Mr. Snow's testimony, *infra*.

pleasantries with them in the hallway. *Id.* at 165:8–166:18. Upon arriving at the scene, Mr. Snow spoke with all three individuals about the incident. *Id.* at 160:1–16. He never heard Ms. Allen or Ms. Foster tell him about Mr. Wilson's alleged racial slur. *Id.* at 176:17–20. Nor did he ever tell them not to mention the alleged racial slur in their voluntary statements. *Id.* at 176:21–177:3. Mr. Snow further testified that he did not require Ms. Allen and Ms. Foster to first speak to Ms. Evans before speaking with him, and that he could not recall a situation where he would impose a requirement like this because his job was to "just collect the facts and what is happening and what did happen." *Id.* at 177:5–178:3. The jury had access to Mr. Snow's incident report, which was created on the same date as the incident. *Id.* at 170:16–22; Pl.'s Ex. 10 (Mr. Snow's incident report); *see also* Pl.'s Ex. 7 (Ms. Allen's voluntary statement); Def.'s Ex. 3 (Ms. Foster's voluntary statement). The jury heard Mr. Snow describe how, within thirty or so minutes of his arrival at the scene, Ms. Allen and Ms. Foster gave voluntary statements to him which he attached to his incident report, and that neither their conversation with him or their statements indicated that Mr. Wilson had made the racial slur. Tr. at 173:14–177:4.

Finally, the jury could have also credited Ms. Evans's testimony concerning the trash can incident. Ms. Evans testified that she was "certain" that neither Ms. Allen nor Ms. Foster ever told her that Mr. Wilson made the racial slur. *Id.* at 967:17–25, 968:13–18. She stated that she would have remembered the racial slur were it uttered because "that phrase connotates violence and ill intent." *Id.* at 968:1–8. Ms. Evans also testified that she never instructed Ms. Allen or Ms. Foster not to make a police report. *Id.* at 968:25–969:2.

The jury assessed Ms. Allen and Ms. Foster's version of events against Mr. Snow and Ms. Evans's conflicting account. It was reasonable for the jury to weigh the conflicting testimony and conclude that Mr. Wilson never uttered the racial slur. It is possible that a jury

*could* have given greater weight to Ms. Allen and Ms. Foster's testimonies despite their impeachment and the existence of conflicting testimony.  But that is *not* the standard that governs a motion under Rule 50(b) and Rule 59(a).  *See Atlanta Channel, Inc. v. Solomon*, No. 15-cv-1823, 2022 WL 3976109, at *4 (D.D.C. Sept. 1, 2022) ("But the fact that there was evidence from which the jury might reasonably have concluded that the Spectrum Act *was* foreseeable in 1999 does not establish that it was unreasonable for them to weigh conflicting evidence and conclude that the Spectrum Act was *not* foreseeable.") (emphasis in original).

Ms. Allen also relies on several other incidents to support her race-based hostile work environment claim.  The next one is a June 4, 2008 incident involving Mr. Wilson and Rachelle Wright, another African-American woman who worked at the Bureau.  *See* Tr. at 41:23–42:2. Ms. Allen was not present during this incident but learned about it afterwards from Ms. Wright. *See id.* at 881:15–21.  On that day, Ms. Wright was in the Bureau's paper lab with Mr. Wilson. *Id.* at 188:6–13.  Mr. Wilson was watching coverage of the 2008 election on the Bureau's internal news network, Bureau News Network ("BNN"), while Ms. Wright was at the back of the lab.  *Id.* at 188:7–13, 222:10–12.  Ms. Wright overhead Mr. Wilson say, "There's no [fucking] way a black man gonna become president," while punching his own hand.  *Id.* at 188:7–13.  Ms. Wright left the lab and reported the incident to Ms. Evans.  *Id.* at 189:7–13.  She also met with Ms. Allen the same day, and the two of them filed a police report.  *Id.* at 189:24–190:3.  At trial, Ms. Evans's testimony largely corroborated Ms. Wright's account of the incident.  *Id.* at 969:9– 19.  The government does not dispute that Mr. Wilson made this statement.  *Id.* at 1276:11–14.

The jury could reasonably find that this single incident was not probative of a race-based hostile work environment.  The Court instructed the jury that "[r]arely is one incident so severe to constitute a hostile work environment.  Even a few isolated incidents of offensive conduct do

not usually amount to actionable harassment." *Id.* at 1347:16–18; *accord Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring). But an incident involving "a deeply offensive racial epithet" or "physical assault" could have alone created a hostile work environment. Tr. at 1347:18–22; *accord Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring). Although Mr. Wilson's statement was race-based, it did not involve a racial epithet. Nor did Mr. Wilson direct this statement toward Ms. Allen—in fact, she was not present during this incident but only learned about it afterwards. *See* Tr. at 881:15–21. While that fact is not necessary to a discriminatory hostile work environment claim, *see* Mem. Op. at 17–18, ECF No. 108, the jury could reasonably find that the statement, placed in the context of the incident—and the context of all of the incidents described at trial—was not severe or pervasive enough to support Ms. Allen's claim. *See id.* at 14–15; *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) (observing that "[c]onduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment"); *Garza v. Blinken*, No. 21-cv-2770, 2023 WL 2239352, at *7 (D.D.C. Feb. 27, 2023) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff" (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997))).

The next incident—known as the "coughing incident"—occurred three years later, on July 27, 2011. Tr. at 889:21–890:9. The jury heard Ms. Allen testify that this was only the second incident that occurred between Mr. Wilson and her since she began working for the Bureau in 2007. *See id.*; *see also id.* at 805:20–25 (Ms. Allen claiming that she "didn't have any interaction with Mr. Wilson" between April 30, 2008 and July 27, 2011).[6] On that day, Ms.

---

[6] Ms. Allen also testified, however, that Mr. Wilson chased her in the hallway each year between 2008 and 2014. Tr. at 936:5–11; *see* Pl.'s Mot. at 21. But several witnesses testified that Mr. Wilson walked with a cane, *see, e.g.*, Tr. at 231:7–10 (Ms. Wright), *id.* at 775:6–8 (Ms.

Allen and Mr. Wilson happened to be walking down the same hallway at the same time.  *Id.* at 891:6–14.  Mr. Wilson drew near to Ms. Allen and coughed.  *Id.* at 808:4–11.  Ms. Allen testified that Mr. Wilson's cough was intentionally directed at her, and some of the residue hit her face.  *Id.*  As she moved away from him, Ms. Allen asked Mr. Wilson to cover his mouth, and he responded, "Only a stupid idiot would say cover your mouth."  *Id.* at 808:4–20.

The jury could reasonably conclude that this incident had little to no probative value to Ms. Allen's race-based claim.  For starters, in light of the passage of three whole years in between the 2008 incidents and this one, the jury had reason to question whether the alleged discrimination was sufficiently "pervasive."  *Id.* at 1347:3–15 (instructing the jury to consider "the totality of the circumstances" including "the frequency of the harassing conduct"); *accord Bing v. Architect of Cap.*, No. 16-cv-2121, 2019 WL 4750223, at *6 (D.D.C. Sept. 30, 2019).  In addition, the jury could have reasonably found that this incident had nothing to do with Ms. Allen's race.  Nothing in Mr. Wilson's speech or conduct suggested that he acted this way because Ms. Allen was African-American.  To the contrary, several witnesses at trial testified about Mr. Wilson's generally unkempt state, including his poor hygiene and chronic coughing problems.  Tr. at 220:4–9 (Ms. Wright), *id.* at 19–22; *id.* at 1015:17–23 (Ms. Evans); *id.* at 773:25–774:20 (Ms. Gonzalez).  A jury could reasonably construe this incident as an example of Mr. Wilson's repugnant (but not discriminatory) behavior in the workplace.  That is not a legally cognizable claim under Title VII.  *See, e.g.*, *Baloch*, 550 F.3d at 1199 ("Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" (citation omitted));

---

Gonzalez), *id.* at 912:10–18 (Ms. Allen), and one witness testified that she never saw him chasing anyone down the hallway, *see id.* at 709:6–17 (Dr. Soto).  The jury could have reasonably discredited Ms. Allen's testimony on this point.

*Stewart v. Evans*, 275 F.3d 1126, 1134–35 (D.C. Cir. 2002) (uttering profanities is insufficient to constitute a hostile work environment).

The next incident—known as the "cane incident"—occurred on February 23, 2012, about seven months after the coughing incident. Tr. at 1291:4–6. Ms. Allen testified that on that day, she was coming out of the lab on the sixth floor and waiting for the elevator when she spotted Mr. Wilson approaching her with his cane lifted. *Id.* at 810:25–811:8. She claimed that Mr. Wilson "struck at" her twice with his cane. *Id.* at 811:19–23. When the elevator doors opened, she went in. *Id.* at 811:9–10. Mr. Wilson did not get in the elevator with her. *Id.* at 911:24–912:3. After the incident, Ms. Allen reported it to Ms. Evans and also went to the police station to give a voluntary statement. *Id.* at 812:22–813:11. During this time, Ms. Allen was "screaming and hollering in the hallway" and was in a "hysterical" state of mind. *Id.* at 814:7–14. She eventually went to the nurse's office and received some medication to calm herself down. *Id.* at 815:14–23. The nurse asked her if she was attacked or hit by the cane. *Id.* at 815:24–816:2. She told the nurse that she was not hit with the cane, but that Mr. Wilson "struck at" her with the cane. *Id.*

As with the coughing incident, the jury could reasonably find that this incident was not probative of a racially motivated hostile work environment. The jury did not hear any evidence tying Mr. Wilson's behavior to Ms. Allen's race. To the contrary, there was evidence that Mr. Wilson lifted his cane out of self-defense, in response to Ms. Allen yelling, "Stay away." *Id.* at 457:13–458:4; Pl.'s Ex. 53 at 51 (voluntary statement that Mr. Wilson gave to agency police on same day of incident explaining that he raised his cane in self-defense); *see also* Tr. at 981:13–18 (Ms. Evans testifying that Mr. Wilson told her he raised cane in "defensive gesture"). On cross-examination, Ms. Allen denied that she told Mr. Wilson, "[s]tay away from me" during this

incident, but the government impeached her with her 2020 deposition where she recalled saying, "Mr. Wilson, you're supposed to stay away from me." *Id.* at 910:20–911:13.[7]  Once again, it was up to the jury to weigh the conflicting evidence and interpret the significance, if any, of this incident.  Even if the jury believed Ms. Allen that Mr. Wilson was unjustifiably belligerent, it could have reasonably declined to interpret this incident as evidence of a racially discriminatory hostile work environment.

The next incident—known as the "break room incident"—occurred on July 18, 2012, about five months after the cane incident.  *Id.* at 922:15–16.  According to Ms. Allen, she was in the office break room eating lunch when Mr. Wilson walked in and approached his mailbox.  *Id.* at 817:20–818:6.  Ms. Allen ran out of the break room and found Ms. Evans, who happened to be in the hallway.  *Id.* at 818:7–9.  She told Ms. Evans that Mr. Wilson had violated the 10-foot separation order that the Bureau had issued to the two of them.  *Id.*  According to Ms. Allen, Mr. Wilson came out of the break room and overheard her conversation with Ms. Evans.  *Id.* at 921:9–16.  According to Ms. Allen, he then said to Ms. Allen, "If you tell one more thing on me." *Id.* at 818:10–11.

As with the cane and coughing incidents, the jury could reasonably find that the break room incident was not probative of a racial hostile work environment.  In fact, it could have viewed the incident as a harmless, accidental encounter between Ms. Allen and Mr. Wilson.  Ms. Allen acknowledged on cross-examination that Mr. Wilson went directly to his mailbox and not to where she was sitting.  *Id.* at 920:9–16.  She also testified that she and Mr. Wilson did not

---

[7] Following the cane incident, the Bureau issued a 10-foot separation order to both Ms. Allen and Mr. Wilson that required each party to stay at least ten feet apart from the other.  Tr. at 915:4–916:21. This, along with the Bureau's other corrective actions, are described in more detail below.

exchange any words during this incident. *Id.* at 920:17–19. In addition, Ms. Allen's testimony as to her location in the break room relative to the mailbox area was different from her deposition testimony in 2020, which could further cast doubt on her recollection of the event. *Id.* at 919:3–920:8. As for the "tell one more thing" statement, the jury once again heard conflicting testimony; Ms. Allen testified that Ms. Evans was present when Mr. Wilson said the phrase, whereas Ms. Evans testified that she did not personally hear Mr. Wilson utter this phrase. *Id.* at 921:6–24, 1024:2–5. To the extent the jury believed that Mr. Wilson uttered this phrase, it could have reasonably concluded that, given the context of the incident as a whole, it was not racially motivated.

The next incident—known as the "hallway incident"—occurred in October 2014, over two years since the break room incident. *Id.* at 737:16–23. Ms. Allen and her colleague Tracy Newell were walking down the hallway to go to the cafeteria when she saw Mr. Wilson coming from the cafeteria. *Id.* at 921:25–922:11. Ms. Allen stopped and told Ms. Newell that they should go back. *Id.* at 925:1–7. The two women turned around to allow Mr. Wilson to pass by. *Id.* According to Ms. Allen, rather than passing her by, Mr. Wilson stopped at the end of the hallway, picked up his cane, and slammed it on the floor twice. *Id.* at 925:10–24. Mr. Wilson did not speak to Ms. Allen and ultimately did not end up walking near or past her. *Id.*

As with the prior incidents, the jury could have reasonably made little of this chance encounter between Ms. Allen and Mr. Wilson. Ms. Newell, who testified at trial, had trouble remembering the details of this incident. *Id.* at 738:1–14. She recalled that Ms. Allen seemed "a little upset" and that they ended up walking in another direction from Mr. Wilson "because the two people wasn't [sic] supposed to meet." *Id.* Jessica Gonzalez, who replaced Ms. Evans as

Ms. Allen's supervisor in 2013, *id.* at 923:10–16; *id.* at 754:6–11,[8] testified that Mr. Wilson told

her that he was not even aware that Ms. Allen had been trying to use the hallway on that

occasion. *Id.* at 780:3–6. Without more evidence about Mr. Wilson's intent or actions, the jury

reasonably disregarded the meaning of this incident in relation to Ms. Allen's claim.

Finally, the jury heard testimony about events that Ms. Allen claims reveal Mr. Wilson's

racial motive. Ms. Allen testified that once, when she and her co-worker Diane Cripps were

walking together in the Bureau, Ms. Cripps told her that she saw Mr. Wilson watching KKK

content on his computer. *Id.* at 816:14–24. Ms. Allen did not personally see what was on Mr.

Wilson's computer screen. *Id.* at 817:2–6. Ms. Evans testified that when she investigated the

matter, Mr. Wilson showed her that he was looking at a comic book and told her that he

"personally found the KKK abhorrent." *Id.* at 1058:12–19. Ms. Cripps did not testify at trial.

The jury could have reasonably credited Ms. Evans's testimony and/or given little weight to Ms.

Allen's second-hand knowledge of an event that no other witness corroborated at trial.

The jury also heard testimony from Brian Horlor about outbursts he heard Mr. Wilson

make in 2018. Mr. Horlor is a Bureau employee whose desk shared a cubicle wall with Mr.

Wilson's desk in 2018. *Id.* at 325:13–23.[9] For a period of time, Mr. Horlor recorded Mr.

Wilson's outbursts by typing them up contemporaneously and emailing them to his supervisor

Clarissa Soto. *Id.* at 328:13–14, 337:4–338:4. Mr. Wilson made these "outbursts" at the

computer screen while "usually watching Fox News." *Id.* at 338:7–17. He frequently directed

---

[8] Ms. Gonzalez testified that she became Ms. Allen's supervisor because of a lab reorganization within the Bureau, and that this had "nothing to do" with Ms. Evans's handling of issues between Ms. Allen and Mr. Wilson. Tr. at 790:2–5.

[9] Per the Court's limiting instruction, the jury considered these post-2014 statements for the sole purpose of establishing Mr. Wilson's motivations in the 2008–2014 period, and not to assess Ms. Allen's alleged hostile work environment. Tr. at 1337:15–24.

his ire at "liberals, Democrats, that sort of thing," *id.* at 341:2–5, including white men such as

Chuck Schumer, John McCain, Robert Mueller, and Bernie Sanders, *id.* at 354:16–355:2; *see,*

*e.g.*, *id.* at 332:6–8 (recorded statement saying "Put Robert Mueller in prison, put him in prison

for treason. He won't have a long sentence, he'll be shot for treason").

From Mr. Horlor's emails, Ms. Allen singles out the phrases "horsewhipping," "hang

nooses," and "lynching mob" as evidence of Mr. Wilson's racial animus.  *Id.* at 336:18, 329:1,

336:16–17.  The jury heard Nichole Jenkins, an African-American woman who worked at the

Bureau's Office of Chief Counsel, testify that "horsewhipping" did not invoke a racial

connotation for her.  *Id.* at 621:18–25, 647:23–648:6; *see also id.* at 349:23–350:5 (Mr. Horlor

testifying that "horsewhipping" is "[o]pen for interpretation").  Although Mr. Horlor testified

that "hanging nooses" and "lynching mob" had racial connotations, *id.* at 348:14–20; *id.* at

349:18–22, he also stated that they were "margin cases . . . open to interpretation."  *Id.* at 351:2–

11.  While the jury could have believed that these phrases, considered in isolation, revealed Mr.

Wilson's racial motivation, it did not hear these words in a vacuum.

Instead, the jury heard these three phrases in the context of all of Mr. Wilson's recorded

outbursts.  Viewing them together, the jury could reasonably conclude that Mr. Horlor's email

records *support*, rather than undermine, the government's theory that Mr. Wilson's behavior was

motivated by political, rather than racial, animus.  The jury saw that Mr. Wilson said, "[t]hey're

going to hang nooses" next to statements such as "[t]he Democrat [c]andidate should be shot for

treason" and "[y]ou need to be shot in the head.  You need to be shot."  Pl.'s Ex. 12-1 (Aug. 31,

2018 email).  And Mr. Wilson said "lynching mob" and "[y]ou should be taken out and horse

whipped" next to statements such as "[t]he only good commie is a dead commie" and "Diane

Feinstein should be removed. Communist."  *Id.* (Sept. 4, 2018 email).  The jury heard Mr. Horlor

characterize Mr. Wilson's outbursts as a whole as "[e]xplosive" and "political." *Id.* at 347:10–

14. And Ms. Jenkins noted that although "historically nooses were used to hang . . . slaves or

black people," "[t]here was no reference in Mr. Wilson's—in any of his statements did he

mention black people. He specifically mentioned commies and specific individuals in the

Democratic Party." *Id.* at 648:8–16. There was more than one way to interpret the meaning of

these statements, and the jury reasonably chose not to take Ms. Allen's position.

          After considering all of the evidence, the jury reasonably determined that these incidents

did not demonstrate a hostile work environment based on race. The jury understood that to

prevail on her claim, Ms. Allen had to show that "she was subjected to discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

her employment and create an abusive working environment." *Id.* at 1347:4–7 (jury instruction);

*accord Oncale*, 523 U.S. at 78; *Baloch*, 550 F.3d at 1201. The jury reasonably concluded that

viewed as a whole, the evidence did not show that Ms. Allen was subject to a hostile work

environment because of her race. The jury considered a record with scant evidence of severe or

pervasive conduct; indeed, many of the incidents Ms. Allen attempted to string together occurred

months, if not years, apart. Several incidents consisted of accidental encounters between Ms.

Allen and Mr. Wilson, and most of them appeared to have nothing to do with race at all.

          Ms. Allen relied heavily on the trash can incident to establish a race-based motive, but as

described above, the government impeached both Ms. Allen and Ms. Foster concerning whether

Mr. Wilson ever uttered, "[k]ill the coon." From that incident forward, the only incident where

Mr. Wilson specifically mentioned race was his interaction with Ms. Wright, when he said,

"There's no [fucking] way a black man gonna become president." Tr. at 188:7–13; *id.* at

222:10–23. Ms. Allen was not even present during that incident. *See id.* at 881:15–21. The jury

could conclude that all of the other incidents showed that Mr. Wilson was an unsavory or rude

person who had strong, sometimes even violent, feelings against Democrats.  In short, the jury

had ample grounds to find that based on the totality of the circumstances, there was no hostile

work environment because of Ms. Allen's race.  For that reason, neither judgment as a matter of

law nor a new trial is justified on this claim.

### 2.  Bureau's Corrective Action

Even if the jury concluded that Ms. Allen experienced a hostile work environment based

on her race, the Court will not disturb the verdict for the alternative reason that the jury

reasonably found that the Bureau took appropriate corrective action.  Recall that this too defeats

Ms. Allen's Title VII claim.  "An employer may be held liable for the harassment of one

employee by a fellow employee (a non-supervisor) if the employer knew or should have known

of the harassment and failed to implement prompt and appropriate corrective action."  *Curry v.*

*District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).  Here, it is undisputed that Mr. Wilson

was Ms. Allen's co-worker.  Thus, the Bureau is only liable if it failed to take prompt and

appropriate corrective action.  The Court instructed the jury to consider what corrective actions

the Bureau took, and whether it was prompt and appropriate.  Tr. at 1349:4–1350:10.  The jury

reasonably found that the Bureau's actions were prompt and appropriate.

The upshot of Ms. Allen's argument is that if the Bureau had taken decisive action

against Mr. Wilson after the first incident between them, Ms. Allen would not have experienced

a hostile work environment between 2008 and 2014.  But the jury heard the Bureau's Human

Resources and Employees Relations specialist, Marla Gissentanna, explain that the agency

follows a progressive discipline model.  *Id.* at 396:19–24, 516:12–517:1, 522:23–523:8.  She

further explained that the Bureau did not employ a "zero tolerance" method of discipline but

rather "look[ed] at things on a case-by-case basis." *Id.* at 522:5–14.  The jury likewise heard

from Ms. Jenkins, an attorney advisor in the Bureau's Office of Chief Counsel during the time of

these incidents, who testified that the Bureau imposed progressive discipline as required by law

and the *Douglas* factors.  *Id.* at 625:22–628:19; *see, e.g.*, *Adair v. Solis*, 742 F. Supp. 2d 40, 66

(D.D.C. 2010) (discussing *Douglas* factors in the context of employee discipline), *aff'd*, 473 F.

App'x 1 (D.C. Cir. 2012).  Finally, the jury heard instruction that "an agency is not liable,

although the alleged harassment persists, so long as each response was reasonable," and that

"[a]n agency is not required to terminate an alleged harasser except when termination is the only

response that would be reasonably calculated to end the harassment."  Tr. at 1350:5–10; *accord*

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998).

    A jury could reasonably conclude that the Bureau took prompt and appropriate corrective

action against Mr. Wilson in each of the following incidents:

- <u>Trash can incident</u>.  Ms. Evans held a meeting with Ms. Allen and Mr. Wilson where

  Mr. Wilson apologized to Ms. Allen.  Tr. at 874:24–865:10.  Ms. Allen testified that

  although Mr. Wilson apologized, both he and Ms. Evans had "smirks on their face"

  and "[i]t was not sincere that he mean[t] it."  *Id.* at 939:10–13.  Ms. Evans, however,

  testified that neither she nor Mr. Wilson smirked at Ms. Allen because it was a "very

  serious situation" and "not funny."  *Id.* at 966:5–12.  She also testified that she did not

  perceive Mr. Wilson's apology to be insincere.  *Id.* at 966:24–967:1.  It was up to the

  jury to decide whose account of the meeting was credible, and it was reasonable for

  them to believe Ms. Evans.  Ms. Evans also took other remedial steps.  She proposed

  that Mr. Wilson be suspended for two days without pay, and Dr. Gupta (Ms. Evans's

  supervisor) approved the suspension.  *Id.* at 527:14–16, 533:21–534:4, 535:24–536:1;

Def.'s Ex. 7 (notice of decision).  In addition, Ms. Evans and Dr. Gupta decided to move Mr. Wilson's desk away from the same office space as Ms. Allen.  Tr. at 965:13–18, 1145:22–1146:1.  Finally, Ms. Evans reached out to an alternative dispute resolution counselor in the EEO office; Mr. Wilson was willing to participate, but Ms. Allen was not.  *Id.* at 967:2–10.

- <u>June 4, 2008 incident between Mr. Wilson and Ms. Wright</u>.  Ms. Evans removed Ms. Wright from working in the lab where the incident occurred.  *Id.* at 189:18–23.  Ms. Wright testified that she had no more incidents with Mr. Wilson because Ms. Evans "kept [them] apart."  *Id.* at 214:20–215:1.  Dr. Gupta held a meeting with all of the parties and told them that internal network news should no longer be played in the lab, and he also asked "security to go through and do periodic walk-throughs."  *Id.* at 970:9–16.  Ms. Evans also testified that she considered moving Mr. Wilson to a different position but could not identity one that fit his skills as "GS12 chemist."  *Id.* at 970:22–971:3.

- <u>Cough incident</u>.  Ms. Evans met with Ms. Allen and Mr. Wilson together and Mr. Wilson apologized to Ms. Allen.  Def.'s Ex. 16 (Ms. Evans's voluntary statement).  Ms. Evans wrote a memo summarizing the event and describing the steps the Bureau took in response.  Def.'s Ex. 21.  After meeting with both of them, Ms. Evans notified the Bureau's Employee and Labor-Management Relations Division for guidance.  *Id.*  The next day, the Bureau's Violence Intervention Team convened and recommended limited contact between Mr. Wilson and Ms. Allen.  *Id.*  Ms. Evans also talked to Mr. Wilson alone and advised him to cover his cough and keep some tissues.  Tr. at 978:8–9.

- <u>Cane incident</u>.  The Violence Intervention Team met the same day.  *Id.* at 981:19–24.
  Ms. Evans testified that the team could not reach a conclusion about what happened
  but decided it was "advisable to issue orders of separation . . . to keep at least 10 feet
  away and avoid contact."  *Id.* at 981:23–982:4.  The 10-foot separation order required
  each party to maintain this distance from the other.  *Id.* at 915:4–916:21.  Ms. Evans
  also asked the office of security for camera footage of the incident but was told that
  there were no recordings of that area of the elevators.  *Id.* at 983:5–17; *see* Def.'s Ex.
  46 (Ms. Evans's email exchange with office of security).

- <u>Break room incident</u>.  Ms. Evans, who happened to be near the parties during this
  incident, spoke to Ms. Allen and Mr. Wilson.  Tr. at 1023:14–1024:15; *see* Def.'s Ex.
  59 (Ms. Evans's memo describing the event and agency action).  The Violence
  Intervention Team met again and advised Ms. Evans to give Mr. Wilson another copy
  of the 10-foot separation order and remind him about the policy.  Tr. at 1024:16–18.
  Ms. Evans also reached out to Mr. Wilson and offered to check his mailbox for him to
  prevent him from having to go into the break room in the future.  *Id.* at 1024:19–25.
  She began checking his mail for him from this point forward.  *Id.* at 1025:1–3.

- <u>Hallway incident</u>.  Ms. Gonzalez asked the parties to submit written statements to
  document the event.  Tr. at 761:11–22.  Ms. Gonzalez also met with her superior and
  Ms. Allen to discuss Mr. Wilson's use of the second-floor hallway where Ms. Allen's
  office was located.  *Id.* at 778:21–779:25.  The Bureau told Mr. Wilson to no longer
  use that hallway, and he agreed.  *Id.*

Despite the significant amount of evidence in the record of the Bureau's corrective
actions, Ms. Allen maintains that they were insufficient.  She points to the Bureau's response to

complaints about Mr. Wilson from Ms. Wright and two white employees, Gary Cloth and Ken Kipperman, as points of comparison.  But the jury could reasonably conclude that the Bureau appropriately tailored its response to each individual's fact-specific circumstances, and that the Bureau's response to Ms. Allen's complaints was commensurate.

Start with Ms. Wright.  Recall that following Ms. Wright's complaint that she heard Mr. Wilson yell, "There's no [fucking] way a black man gonna become President," Ms. Evans removed her immediately from working in the same lab as Mr. Wilson.  Ms. Allen argues that the Bureau treated Ms. Wright more favorably because they removed Ms. Wright from being in the same environment as Mr. Wilson but did not do the same for her, at least not initially.  Tr. at 1240:11–14.  Apparently, Ms. Allen was still working in the same cubicle area as Mr. Wilson on May 8, 2008, about a week after the trash can incident.  *Id.* at 1075:5–13.  But Ms. Evans testified that she placed an administrative request to move Mr. Wilson's desk away from Ms. Allen on April 30, 2008, the same day as the trash can incident.  *Id.* at 1163:6–13.  Although some of Mr. Wilson's magazines and files were still at his old desk in May, and he would linger there occasionally, Ms. Evans personally moved those files to speed up the process of his move.  *Id.* at 1163:21–1164:2.  The jury also heard that unlike in Ms. Allen's case, it was easier for Ms. Evans to move Ms. Wright to a different position because Ms. Wright was only a seventeen-year-old student intern at the time.  *Id.* at 224:16–225:5; *see also id.* at 237:8–9 (Ms. Wright testifying that "our situations were two different ones").[10]

---

[10] Ms. Allen's counsel speculated to the jury that Ms. Wright cut "some kind of deal" with Ms. Evans—allegedly, in exchange for being moved out of the same environment as Mr. Wilson, Ms. Wright agreed to remove the word "fucking" from her report of what Mr. Wilson said.  Tr. at 1240:17–24.  But Ms. Wright herself rejected this theory; she testified that Ms. Evans never told her to omit certain words from her report or alter them in any way.  *Id.* at 217:2–15.

The jury also heard evidence involving an incident between Mr. Wilson and a white employee, Mr. Cloth.  On June 25, 2012, Mr. Wilson was standing at a copier outside the paper lab when Mr. Cloth walked past him in route to the restroom.  Tr. at 1025:23–1026:14.  As Mr. Cloth walked by, Mr. Wilson made an angry gesture and jabbed his cane in Mr. Cloth's direction.  *Id.*  Mr. Cloth told Mr. Wilson that he should not joke like that, and Mr. Wilson responded in a raised voice that he was not joking.  *Id.*  In response to this incident, Ms. Evans issued Mr. Wilson a letter of warning.  *See* Pl.'s Ex. 71.

Ms. Allen argues that the Bureau treated Ms. Allen unfairly because they did not investigate her cane incident with Mr. Wilson, whereas they investigated Mr. Cloth's complaint for several months following the incident.  But the jury could have reasonably found that the Bureau *did* investigate Ms. Allen's cane incident.  As described above, the Violence Intervention Team met the same day.  Tr. at 981:19–22.  Ms. Evans testified that the team could not reach a conclusion about what happened in her cane incident but ultimately issued a ten-foot separation order to Ms. Allen and Mr. Wilson.  *Id.* at 915:4–916:21, 981:23–982:4.  Ms. Evans also asked the office of security for camera footage of the incident but was told that there were no recordings of that area of the elevators.  *Id.* at 983:5–17; *see* Def.'s Ex. 46 (Ms. Evans's email exchange with office of security).  Moreover, Mr. Cloth's case had different facts.  Tr. at 1307:5–1308:25.  First, the incident marked the second time that Mr. Wilson had allegedly used his cane in an inappropriate manner—and only four months after being accused of raising his cane at Ms. Allen.  *Id.* at 1307:12–20.  And in Mr. Cloth's case, Mr. Wilson admitted to threatening Mr. Cloth with his cane, whereas in Ms. Allen's case, Mr. Wilson claimed he was acting in self-defense.  *Id.* at 1308:23–25, 457:13–458.  Second, unlike the cane incident with Ms. Allen, the incident with Mr. Cloth involved a significant breach of security protocol.  *Id.* at

1308:3–18.  Finally, the jury also learned that the Bureau punished Mr. Wilson for the Cloth incident with a letter of warning, *see* Pl.'s Ex. 71, which the jury could have found comparable to the Bureau's response to Ms. Allen's cane incident.

The final comparator Ms. Allen relies on is Ken Kipperman, a white employee who complained to the Bureau about Mr. Wilson in January 2013.  Tr. at 1027:11–17; Pl.'s Ex. 84 (Notice of Proposed Suspension from Ms. Evans to Mr. Wilson).  One day in the Bureau, Mr. Wilson was at a vending machine trying to make a purchase with his coins.  Tr. at 1027:18– 1028:2.  When one of Mr. Wilson's coins fell on the floor, he began stomping on it.  Mr. Kipperman was in the area, and Mr. Wilson yelled at Mr. Kipperman in a threatening manner to get away from him.  *Id.*  As a result of this incident, Ms. Evans proposed suspending Mr. Wilson for five days without pay.  *Id.* at 1028:7–19; Pl.'s Ex. 84.  The notice stated that this severe penalty was appropriate because Mr. Wilson had prior warnings about similar outbursts and was currently subject to a ten-foot separation order with a different employee (*i.e.*, Ms. Allen).  Pl.'s Ex. 84 at 1–2.  After considering Mr. Wilson's written response, Ms. Evans reduced the penalty to a two-day suspension.  Def.'s Ex. 79 (notice of decision).  Ms. Evans explained that a note from Mr. Wilson's doctor describing his chronic anxiety's role in his outbursts helped to mitigate the penalty.  *Id.*; Def.'s Ex. 60 (doctor's note).  The jury could have viewed the Bureau's response to the Kipperman incident as appropriate and in harmony with how it responded to Ms. Allen's incidents.  In short, the jury reasonably concluded that the Bureau's corrective actions were prompt and appropriate.  For this independent reason, neither judgment as a matter of law nor a new trial is justified on this claim.

### B.  Discriminatory Hostile Work Environment Based on Gender

The jury also reasonably concluded that Ms. Allen's second claim, discriminatory hostile work environment based on her gender, was also meritless.  At the close of evidence, when the government moved for judgment as a matter of law, the Court asked Ms. Allen's counsel to explain his "best case" for why "Ms. Allen was subjected to a hostile work environment based on gender."  Tr. at 1189:7–9.  Ms. Allen's counsel argued that "Mr. Wilson treated [Ms. Allen] differently based on her gender because he realized that there was a woman who would not attack him."  *Id.* at 1190:21–1191:3.  But Ms. Allen highlighted virtually no evidence in the record for the jury to draw the conclusion that Mr. Wilson mistreated her because of her gender, and instead focused her trial strategy heavily on race.  Ms. Allen's post-trial brief suffers from the same defect in failing to identify what evidence supports her gender-based hostile work environment claim.  Nonetheless, the Court will attempt to tease out Ms. Allen's argument in an effort to consider this issue fully.

There is some evidence in the record that shows that Mr. Wilson behaved poorly around women.  The trash can incident involved two women—Ms. Allen and Ms. Foster.  *Id.* at 796:2–5.  And the June 4, 2008 incident involved Ms. Wright, another woman.  *Id.* at 188:6–13.  In addition, Ms. Gonzalez testified that she herself was afraid of Mr. Wilson.  *Id.* at 742:1–14, 743:20–22.  She described an incident at the Bureau in the late 1990s or early 2000s when, after she pointed out some errors in his work, he responded by angrily banging his head five times on her door and storming out of her office.  *Id.* at 741:2–742:17.

But the jury also heard evidence that *men* were victims of Mr. Wilson's behavior, too.  The jury heard that Mr. Wilson was unpleasant, rude, and sometimes even violent toward men.  As discussed above, Mr. Cloth and Mr. Kipperman—two men at the Bureau—each complained

about Mr. Wilson's behavior, which included making violent motions with his cane and stomping on the ground in rage. *Id.* at 1025:23–1026:14, 1027:11–1028:19. Mr. Wilson's similarly repugnant behavior toward men is hard to square with Ms. Allen's theory that Mr. Wilson singled out women because they were less likely to push back. Indeed, Ms. Allen, Ms. Foster, Ms. Wright, Ms. Gonzalez, Mr. Cloth, and Mr. Kipperman *all* complained to the Bureau about Mr. Wilson's behavior, and the jury heard evidence about how the Bureau investigated and punished him for these incidents.

As with Ms. Allen's race-based claim, a reasonable jury could conclude that her gender-based claim fails because the Bureau took prompt and appropriate corrective action. If the Bureau only took complaints from men seriously, Ms. Allen's gender-based claim would have some force. But the jury heard Ms. Wright—a woman—testify that Ms. Evans *adequately* addressed her complaint about Mr. Wilson's behavior in the June 4, 2008 incident. Tr. at 236:15–24. Thus, the jury could reasonably infer that neither Mr. Wilson nor the Bureau treated Ms. Allen differently because of her gender. Neither judgment as a matter of law nor a new trial is justified on this claim.

### C.  Retaliatory Hostile Work Environment

The antiretaliation provision of Title VII "[p]rohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e–3(a)). This Court has previously explained that most courts have interpreted "discriminatory intimidation," which is the phrase used in *Baird v. Gotbaum* ("*Baird I*"), 662 F.3d 1246, 1250 (D.C. Cir. 2011), for the retaliatory hostile-work-environment standard,

"as requiring a demonstration of *retaliatory*, rather than discriminatory, intimidation—that is, intimidation based on the employee's participation in protected activity rather than her membership in a protected class." *Román*, 149 F. Supp. 3d at 166. "To prove retaliation, a plaintiff must show that '(1) [she] engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action.'" *Baird v. Gotbaum* ("*Baird II*"), 792 F.3d 166, 168 (D.C. Cir. 2015) (quoting *Hairston v. Vance–Cooks*, 773 F.3d 266, 275 (D.C. Cir. 2014)).

To engage in protected activity, an individual need not utter "magic words," but her "complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006); *see also Peters v. District of Columbia*, 873 F. Supp. 2d 158, 202 (D.D.C. 2012) ("While informal complaints to management may constitute protected activity, the plaintiffs must clearly complain about discriminatory treatment."). The adverse action must be "material," meaning "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68, 57. "This Circuit has recognized that a hostile work environment can constitute a materially adverse action for retaliation claims." *Chan Chan v. Child.'s Nat'l Med. Ctr.*, No. 18-cv-2102, 2019 WL 4471789, at *8 (D.D.C. Sept. 18, 2019). In an earlier opinion, the Court explained the type of conduct that could constitute a retaliatory hostile work environment:

> In a retaliatory hostile work environment claim, a plaintiff argues that the "cumulative effect," *see Nat'l R.R. Passenger Corp.*, 536 U.S. at 115, of "adequately linked" acts amount to a "coherent hostile environment claim." *Baird II*, 792 F.3d at 168 (citing *Baird I*, 662 F.3d at 1251). To be adequately linked, such acts might, for example, "involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers." *Id.* (citing *Baird I*, 662 F.3d at 1251 (alterations omitted)).

*Allen*, 2019 WL 2581323, at *8.  The conduct must also, of course, be sufficiently severe or pervasive, as discussed above.  *Id.*

In this case, the jury reasonably found that there was no retaliatory hostile work environment.  Ms. Allen relies on primarily two arguments in support of her retaliatory hostile work environment claim, but neither is persuasive.[11]  First, she argues that Ms. Evans retaliated against her by assigning her and other African-American women who had engaged in protected activity to a clean-up crew on or around June 23, 2008.  *See* Pl.'s Mot. at 20[12]; Def.'s Opp'n at 12.  The problem with this theory is that Ms. Evans testified that she first learned about Ms. Allen's 2008 EEO complaint *four days after* the clean-up duty had already occurred.  Tr. at 972:16–22; Def.'s Opp'n at 11–12.  This sequence of events is fatal to Ms. Allen's effort to attribute a retaliatory motive to Ms. Evans.  *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79 (D.D.C. 2013) (noting that retaliation requires that "the defendant kn[o]w of plaintiff's protected activity").  To the extent Ms. Allen identifies the protected activity as her complaint to Ms. Evans about the trash can incident (which preceded the clean-up duty assignment), this theory suffers from a different flaw: the jury could reasonably believe that it was not protected activity.

---

[11] Ms. Allen also seems to argue that the Bureau's treatment of Ms. Wright is evidence of retaliatory motive because it immediately moved Ms. Wright but not Ms. Allen.  "It is well established that, to be successful in the use of comparator evidence, 'the plaintiff must point to a *similarly situated* employee outside of a protected class[.]'"  *Sledge v. District of Columbia*, 63 F. Supp. 3d 1, 17 (D.D.C. 2014) (emphasis in original) (citation omitted).  Here, for the reasons described in the corrective action section, *supra* at 24 & n.10, the jury could have reasonably concluded that Ms. Wright was not an apt comparator because she was a seventeen-year-old intern who was easier to move, and because Mr. Wright herself testified that she was differently situated than Ms. Allen.  *Cf. Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (finding proposed comparators were not "similarly situated" to plaintiff where "[n]one of them had the same position he had").

[12] Ms. Allen's brief claims this incident occurred on July 23, 2008, but that is inconsistent with this Court's previous opinion and the evidence at trial.  *See* Mem. Op. at 4, 20 (citing Opp'n Ex. 1 at ECF p.106, ECF No. 83-8); Tr. at 882:20–883:3.

To establish protected activity, the individual must "allege unlawful discrimination." *Broderick*, 437 F.3d at 1232. But Ms. Allen did not present the jury any documentation showing that she made a complaint of *discrimination*. Her voluntary statement to the police, for example, at most alleged assaultive conduct (Mr. Wilson throwing or kicking the trash can toward her chair), but that is not, standing alone, protected by Title VII. Pl.'s Ex. 7 (Ms. Allen's voluntary statement); *see* 42 U.S.C. § 2000e-3(a) (defining protected activity as "oppos[ing] any practice made an unlawful employment practice by this subchapter"); *Oncale*, 523 U.S. at 80 ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]*.'" (emphasis and alteration in original)). That document does not allege discrimination. And because the government impeached both Ms. Allen and Ms. Foster concerning whether Mr. Wilson ever uttered, "[k]ill the coon," the jury could reasonably conclude that there was no complaint of discrimination, and hence no protected activity predating the clean-up assignment.[13]

In any event, even if the jury thought that Ms. Allen engaged in protected activity and that Ms. Evans knew about it before the clean-up assignment, the jury could reasonably conclude that the clean-up assignment was not retaliatory. At trial, the jury heard testimony that Ms. Evans asked one of her colleagues, Charlotte Lowe-Ma, to assign Ms. Allen, Ms. Wright, and Ms. Foster to a clean-up detail as retaliation for their complaints about Mr. Wilson. Tr. at 809:9–810:2 (Ms. Allen), 231:11–232:16 (Ms. Wright); 63:3–64:4 (Ms. Foster). Ms. Allen testified

---

[13] The jury could have also reasonably found a lack of causal connection between the trash can incident on April 30, 2008 and the clean-up duty on June 23, 2008, which occurred about two months later. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (observing that two months may be too distant to infer "retaliatory motive"). Likewise, Ms. Allen's passing argument that Ms. Evans retaliated against her by assigning her and Mr. Wilson both to work in the durability lab on December 5, 2008—over half a year since the trash can incident—is weak for the same reason. Tr. at 943:11–944:9.

that clean-up duty was outside of their job descriptions and that the Bureau assigned only the three of them to do it.  *Id.*  Upon learning of this assignment, Ms. Allen asked Ms. Evans why she had assigned three African-American women to clean-up duty.  *Id.* at 810:3–6.  Afterward, Ms. Allen heard from Ms. Lowe-Ma that other people would also join in the clean-up duty.  *Id.* at 810:7–10.

On cross-examination, the government impeached Ms. Foster with her 2008 EEO declaration in which she stated the following about the significance of the clean-up duty assignment: "I believe that this was a big misunderstanding from both parties."  *Id.* at 103:18– 104:11.  Ms. Foster's declaration explained that "When [Ms.] Lowe-Ma asked us Rachelle Wright, Patricia Allen, and myself . . . we were the only people present in the lunch area," "[s]o we all took it as [if] we were the only people that had to participate in the office clean up."  *Id.* at 104:12–19 (alteration omitted).  On cross-examination, however, Ms. Foster appeared to back down from her declaration and claimed that "Mrs. Evans only put other people in the detail just so that it did not look like we were being punished for what we did, for us making the statements that we made."  *Id.* at 101:11–22.

The jury heard contrary testimony from Ms. Evans.  Ms. Evans testified that the office clean-up was needed to clear out some clutter for new office equipment.  *Id.* at 971:6–16. Charlotte Lowe-Ma suggested to Ms. Evans that they ask Ken and Diane, two white employees, to help.  *Id.* at 971:16–22.  Later that day, Ms. Evans saw Ms. Allen, Ms. Wright, and Ms. Foster in the break room, and told Ms. Lowe-Ma to ask the three of them to help.  *Id.* at 971:23–972:1. Ms. Evans testified that in addition to asking these three women, Ms. Lowe-Ma also asked Ken and Diane and a few others to help.  *Id.* at 972:2–6.  As for who actually participated in the clean-up besides Ms. Allen, Ms. Wright, and Ms. Foster, the jury once again heard conflicting

testimony.  Ms. Evans testified that there were a mix of various races represented at the clean-up. *Id.* at 972:7–11.  Ms. Allen testified that she did not know whether management had asked anyone else to participate in the clean-up, and that if others did, "[m]aybe they we[re] in another [area]" because she did not see them.  *Id.* at 884:17–24.  Ms. Foster initially testified that "just the three" African-American women attended the clean-up, *id.* at 63:17–18, then appeared to agree that other people besides them attended the clean-up, *id.* at 100:13–16, before finally stating that only one additional person named Darielle (who was also an African-American woman) joined the clean-up, *id.* at 102:2–12.

In the face of this conflicting evidence, the jury could reasonably reach the conclusion that Ms. Allen's interpretation of the clean-up duty was just a misunderstanding.  The jury heard *consistent* testimony that Ms. Evans saw Ms. Allen, Ms. Wright, and Ms. Foster together in the breakroom.  *Id.* at 809:15–20 (Ms. Allen); *id.* at 971:23–972:1 (Ms. Evans).  The jury could have believed Ms. Evans's version of the story and Ms. Foster's EEO declaration that there was a misunderstanding.  The jury also heard that Ms. Evans and the Bureau had in fact taken certain actions against Mr. Wilson in response to the trash can incident and the June 4, 2008 incident involving Mr. Wilson and Ms. Wright.  Especially absent clear evidence that it was just these three women who performed the clean-up, the jury could have found the government's account more believable.

Ms. Allen's second argument in support of her retaliation claim centers on the Bureau's response to the cane incident between Mr. Wilson and herself.  According to Ms. Allen, the Bureau retaliated against her by refusing to investigate her complaint and instead investigated *her* for allegedly lying about the incident.  Pl.'s Mot. at 25.  The jury could have reasonably found that the evidence weighed against this argument.  With respect to whether the Bureau

adequately investigated the matter, Ms. Evans testified that the Bureau properly investigated the incident.  Tr. at 290:15–16.  The government presented evidence supporting this testimony.  *See id.* at 981:19–24 (Violence Intervention Team met the same day); Def.'s Ex. 46 (Ms. Evans's email exchange with office of security for video footage); Tr. at 981:23–982:4 (Ms. Evans testifying that the team could not reach a conclusion about what happened but decided it was "advisable to issue orders of separation . . . to keep at least 10 feet away and avoid contact").

With respect to the Bureau's investigation of whether Ms. Allen made a false report, the jury could reasonably conclude that the Bureau conducted this investigation in good faith to determine what actually happened during the cane incident.  Ms. Allen testified that she told Sergeant Henderson that Mr. Wilson "struck at" her, but that Sergeant Henderson interpreted her statement to mean that Mr. Wilson "struck" her.  Tr. at 814:18–815:1.  The jury had reason not to attribute this misunderstanding to a retaliatory motive.  The jury heard Ms. Allen admit that in the immediate aftermath of the cane incident, she was "hysterical" and in "no state of mind," and even the nurse was asking her if she was attacked or hit with the cane.  *Id.* at 813:12–20, 815:18–23, 913:9–10; *see also id.* at 913:15–18 (Ms. Allen testifying, "When Sergeant Henderson came to the health unit, he said that he could have misunderstood me . . . because of my emotion and state I was in.  So there was some misunderstanding somewhere . . . .").  The jury also heard Ms. Allen testify that the Bureau ultimately cleared her and concluded that she did not provide a false report, another indication that the Bureau did not use the investigation as a pretext for retaliation.  *Id.* at 913:25–914:4.  Moreover, there was no evidence presented attributing retaliatory motive to Sergeant Henderson, who was the reported source of the misunderstanding.

Not only could the jury have found that the record weighed against Ms. Allen's arguments, it could also have credited *affirmative* evidence supporting the government's position

that no retaliatory hostile work environment existed.  In her 33 years at the Bureau, Ms. Allen

never received any disciplinary reports against her.  *Id.* at 791:18–20.  And Ms. Allen testified

that she continued to receive praise and cash awards after the trash can incident.  *Id.* at 886:23–

890:2 (Ms. Allen receiving cash awards in 2009 and 2011); *id.* at 878:9–881:13 (Ms. Allen

receiving praise from Ms. Evans by emails).  The jury could consider the Bureau's positive

treatment of Ms. Allen to cast further doubt on her account of the agency's alleged retaliation.

Thus, neither judgment as a matter of law nor a new trial is justified on this claim.[14]

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment as a matter of law or, in the

alternative, for a new trial (ECF No. 187) is **DENIED**.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 9, 2023                                               RUDOLPH CONTRERAS
                                                                          United States District Judge

---

[14] Ms. Allen also appears to argue that Mr. Wilson himself retaliated against her for engaging in protected activity.  Tr. at 1237:10–18.  Although Ms. Allen did not develop this argument at trial, she appears to rely on Mr. Wilson's "if you tell one more thing on me" statement as an example.  But the jury could have reasonably believed that Mr. Wilson never uttered this statement, *see supra* at 15–16, or that this statement was insufficient in severity to constitute a hostile work environment or causally connected in time to protected activity.